The judgment appealed from is reversed and plaintiff's suit is dismissed at his costs.

73 So.2d 180

**MURPHY CORP. et al.**

**v.**

**FONTENOT, Collector of Revenue.**

**NATURAL GAS & OIL CORP. et al.**

**v.**

**FONTENOT, Collector of Revenue.**

Nos. 41368, 41369.

March 22, 1954.

Rehearing Denied April 26, 1954.

John B. Smullin, Levi A. Himes, Baton Rouge, George C. Gibson, Ponchatoula, for defendant-appellant.

C. Ellis Ott, Bogalusa, amicus curiae.

Shotwell & Brown, Oliver & Oliver, Monroe, Cook, Clark & Egan, Shreveport, for plaintiffs-appellees.

MOISE, Justice.

The issues being identical, these two cases were consolidated for the purposes

of trial. The State of Louisiana, through its Collector of Revenue, Rufus W. Fontenot, imposed severance gas gathering taxes on fugitive gas captured by the plaintiff-lessees, Murphy Corporation et al. and Natural Gas and Oil Corporation et al., from a part of the lands of Barksdale Air Force Base. Plaintiffs paid these taxes, in the amounts of $2,371.29 and $1,191.04, respectively, under protest. This suit is for a refund of the money so paid. The district court rendered judgment as prayed for by the plaintiffs.

From that judgment the State of Louisiana prosecutes this appeal.

The following pertinent facts will be shown by the stipulation of record.

Feeling that it would be advantageous to the inhabitants af Shreveport, Louisiana and Bossier Parish, there was donated to the United States Government in the year 1930 by the City of Shreveport and the Parish of Bossier 22,000 acres of land in Bossier Parish, Louisiana to be used as an Army Air Force Base. The State of Louisiana donated the beds of the waters within the area. Thereafter, the Barksdale Air Force Base was constructed and was operated by the Secretary of War.

On April 16, 1943, the Secretary of War wrote a letter of acceptance to the Governor of the State of Louisiana in which he stated that the primary purpose of the land was for military purposes.

During the early part of 1951, a determination was made that a part of these lands which had been conveyed contained oil and gas deposits and were being drained by private enterprise engaged in the business of capturing the fugitive oil and gas deposits from the soil and reducing such to private ownership. Protective measures from the drainage were sought and secured by the Government's selling exploratory rights to private purchasers or lessees who became the owners of all the severed minerals when they were captured, except a ⅜ths royalty paid the U. S. Government.

On April 2, 1941, the then eminent Attorney General of the United States, after being called in consultation and after having a conference with the Cabinet and with the President of the United States, wrote an advisory letter to the President in which he directed that there was an implied authority in the President to take protective measures in cases where lands, acquired by the United States for a specific purpose, are found to contain minerals which are being drained by adjoining owners—such lands not being subject to the Mineral Lands Leasing Act of February 25, 1920, 41 Stat. 437, as amended, U.S.C.A., title 30, sec. 181 et seq. It was also stated in the letter that if it were advisable, or more convenient, protective action could be taken by another department or agency. The Attorney General's letter stated:

"If, however, it should be determined in particular cases that it is advisable or more convenient for the protective action to be taken by another

department or agency it is within your power to transfer to the latter department or agency by Executive order the necessary authority, duty and jurisdiction with respect to the oil, to be exercised, however, upon the condition and to the extent that there is no interference with the primary use of the land."

Pursuant to this letter, and by virtue of Public Land Order 701, published in the Federal Register of February 28, 1951, Volume 16, No. 40, Page 1901, and pursuant to the authority granted by Executive Order No. 9337 of April 24, 1943, U.S. Code Cong.Service 1943, p. 5.39, the right to sell leases of exploration for fugitive oil and gas in certain described tracts of Barksdale Air Force Base was transferred to the Department of the Interior with the provision that: "There is no interference with the primary use of Barksdale Air Force Base."

The Department of the Interior advertised for bids to carry out the measures of protection. Natural Gas and Oil Corporation and W. R. Stephens were the successful bidders. On July 31, 1951, W. R. Stephens assigned his undivided one-half interest to Murphy Corporation, one of the present plaintiffs.

In the lease granted to the plaintiffs, the usual clause common to such leases was included, with certain restrictions of operation, and the Government retained ⅜ths royalty rights in the oil and gas produced.

The leased land for the described purposes was 2,060 acres out of the 22,000 acres donated. The land leased was set apart from the land used for the governmental purposes of the Air Force Department. In fact, there was a dividing fence between the oil field and the Air Force Base. These private owners were granted the right of use and control over all instrumentalities, owned and constructed by them, such as drilling machines, towers, tanks and pipe lines for their private commercial purposes to explore for oil and gas and to reduce such to private ownership. Under these considerations, the State of Louisiana imposed a non-discriminatory tax at the time of severance.

Upon severing gas from the leased lands, the plaintiffs paid the Louisiana Gas Gathering Severance Tax, LSA–R.S. 47:- 631 et seq., under protest and now contend that the exclusive jurisdiction of the United States over the lands from which the gas was extracted has divested the State of Louisiana of its jurisdiction to collect taxes by virtue of Article I, § 8, Clause 17, of the Constitution of the United States and Act No. 12 of the Louisiana Legislature of 1892 and Act No. 31 of 1942, LSA–R.S. 52:1.

Article I, § 8, Clause 17 of the Constitution of the United States provides that Congress shall have the power to:

"exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as

may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, * * * and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings".

█ The above facts show that the land leased was not to be used for the erection of a fort, magazine, arsenal, dock-yard or other needful buildings for military purposes. When the Federal Government granted to the private oil operators the right of exploration for oil and gas for their private commercial purposes, it was not the intention to take away from the donating State the right to collect its severance taxes which apply to all operators alike within the territorial jurisdiction of Louisiana.

Act No. 12 of 1892 of the Legislature of Louisiana, as amended by Act No. 31 of 1942, carried in the LSA–Revised Statutes as 52:1 reads:

"The United States, in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States, may acquire and occupy any land in Louisiana required for the purposes of the federal government. The United States shall have exclusive jurisdiction over the property during the time that the United States is the owner or lessee of the property. The property shall be exempt from all taxation, assessments, or charges levied under authority of the state.

"The state may serve all civil and criminal process issuing under authority of Louisiana on the property acquired by the United States."

█ It is self-evident that the tax herein imposed is not levied on the property of the United States but on the property of the lessees, who use the gas and oil for their private commercial purposes.

█ We do not deny the exclusive federal jurisdiction over the donated lands or over any instrumentalities of the Federal Government, but our United States Supreme Court and the Attorney General of the United States have set out the navigable lanes for proper procedure. In fact, it was stated in the case of Fort Leavenworth R. Co. v. Lowe, Sheriff, 114 U.S. 525, 5 S.Ct. 995, 1002, 29 L.Ed. 264:

"Where, therefore, lands are acquired in any other way by the United States within the limits of a state than by purchase with her consent, they will hold the land subject to this qualification: that if upon them forts, arsenals, or other public buildings are erected for the uses of the general government, such buildings, with their appurtenances, as instrumentalities for

the execution of its powers, will be free from such interference and jurisdiction of the state as would destroy or impair their effective use for the purposes designed. Such is the law with reference to all instrumentalities created by the general government. Their exemption from state control is essential to the independence and sovereign authority of the United States within the sphere of their delegated powers. *But, when not used as such instrumentalities, the legislative power of the state over the places acquired will be as full and complete as over any other places within her limits.*" (Italics ours.)

Under the above pronouncement, the authority to tax is vested in the State, and the immunity of the private owners under their theoretical concept is divested.

Act No. 12 of 1892, as amended, LSA–R.S. 52:1, was a legislative consent of the State of Louisiana to the donation of the lands herein involved. This consent was evidence, as shown from the facts, that property was exempt from taxation as long as it was used for military purposes. Exclusive legislative jurisdiction was granted to the federal government over the Air Base. The acceptance, as shown from the facts, by the Secretary of War states that the property is to be used for military purposes. When the Secretary of War transferred certain portions of the land to the Department of the Interior, and the Commandant of the Air Base certified that such leases would not interfere with the governmental operations of the Air Base, we had a splendid affirmative of the position taken by the State.

In the operation of the oil field, the lessees were not militarily engaged. The fugitive oil and gas when captured did not belong to the Federal Government but to private owners. No severance tax is levied against the Government nor is there any tax levied on the lands or the instrumentalities of the Federal Government.

There are no decisions on the same facts as set forth in the instant case, but we have the statutes of the United States and pertinent decisions on this Constitutional question by which the Government can mold a sound public policy. Therefore, the question here is not: "Who furnished the stone or owned the quarry?" but, "Who sculptured the statute emblematic of the public policy?"

▇ The agreement of the parties is the law of the case, and in that lease, in Section 2, under Rentals and Royalties, (7) (K), it is provided:

"To pay when due, all taxes lawfully assessed and levied under the laws of the State or the United States upon improvements, oil and gas produced from the lands hereunder, or other rights, property, or assets of the lessee; to accord all workmen and employees complete freedom of pur-

chase, and to pay all wages due work-men and employees at least twice each month in the lawful money of the United States."

The present lease was not made under the Federal Leasing Act of February 25, 1920, 30 U.S.C.A. § 186 et seq., but the lease itself, especially Section 2(7) (K), incorporates many provisions of that statute.

The highest law officer in the Nation sculptured the design of the statute representing the public policy. The President gave the necessary orders under the direction of the sculpturer. The governmental department heads gave a loyal allegiance and faithful service to the pattern.

To follow the plaintiffs' contentions, we must give no effect to the mandatory provisions of Section 2(7) (K) of the lease in question, and we must likewise say that such a provision together with the pertinent authorities on Constitutional questions by the courts are mere abstractions affording no real protection.

The case of Helvering v. Mountain Producers Corporation, 303 U.S. 376, 58 S.Ct. 623, 82 L.Ed. 907, held that the income received by a lessee under a lease from the state of Wyoming of lands granted to the state for school purposes was subject to federal income tax and immunity could not be claimed. The Court overruled the cases of Gillespie v. State of Oklahoma, 257 U. S. 501, 42 S.Ct. 171, 172, 66 L.Ed. 338, and

Burnet v. Coronado Oil & Gas Co., 285 U. S. 393, 52 S.Ct. 443, 76 L.Ed. 815. The Court in citing decisions favorable to its view stated (Chief Justice Hughes being the organ of the Court):

"These decisions in a variety of applications enforce what we deem to be the controlling view—that immunity from non-discriminatory taxation sought by a private person for his property or gains because he is engaged in operations under a government contract or lease cannot be supported by merely theoretical conceptions of interference with the functions of government. Regard must be had to substance and direct effects. And, where it merely appears that one operating under a government contract or lease is subjected to a tax with respect to his profits on the same basis as others who are engaged in similar businesses, there is no sufficient ground for holding that the effect upon the government is other than indirect and remote. We are convinced that the rulings in Gillespie v. [State of] Okla., supra, and Burnet v. Coronado Oil & Gas Co., supra, are out of harmony with correct principle and accordingly they should be, and they now are, overruled." [303 U.S. 376, 58 S.Ct. 627.]

The overruled cases had denied to Oklahoma the right to exact or enforce taxes from lessees of school lands and restrict-

ed Indian lands. Thus we see the dawning of a transition period in our jurisprudence.

The case of James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 216, 82 L. Ed. 155, involved the question of whether a tax imposed by the state of West Virginia upon the gross receipts of a contractor under contracts with the United States was constitutional. The Court held that the tax did not interfere with the performance of federal functions and was a valid exaction. The Court stated:

"The application of the principle which denies validity to such a tax has required the observing of close distinctions in order to maintain the essential freedom of government in performing its functions, without unduly limiting the taxing power which is equally essential to both nation and state under our dual system. * * * We said [Willcuts v. Bunn, 282 U.S. 216, 51 S.Ct. 125, 75 L.Ed. 304, 71 A.L.R. 1260]: 'The power to tax is no less essential than the power to borrow money, and, in preserving the latter, it is not necessary to cripple the former by extending the constitutional exemption of taxation to those subjects which fall within the general application of non-discriminatory laws, and where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government.'"

In the case of Wilson v. Cook, 327 U.S. 474, 66 S.Ct. 663, 670, 90 L.Ed. 793, the State of Arkansas had legislative jurisdiction, and the Supreme Court of the United States made the following statement with respect to the assessed severance tax:

"We conclude that the state has legislative jurisdiction over the federal forest reserve lands located within it, whether they were originally a part of the public domain of the United States, or were acquired by the United States by purchase, and that the tax assessed against plaintiffs is not subject to any constitutional infirmity, or to any want of taxing jurisdiction of the state to lay it with respect to transactions on the federal forest reserve located within the state."

In the cases of Oklahoma Tax Commission v. Texas Co. (Oklahoma Tax Commission v. Magnolia Petroleum Co.), 336 U.S. 342, 69 S.Ct. 561, 562, 93 L.Ed. 721, the Court stated:

"The principal question is whether a lessee of mineral rights in allotted and restricted Indian lands is immunized by the Constitution against payment of non-discriminatory state gross production taxes and state excise taxes on petroleum produced from such lands."

The United States Supreme Court held that since Congress had not immunized the lessees, and prior decisions had not brought about such legislation, Congress

had accepted the decision of the Court permitting state taxation with equanimity. In permitting the tax, the Court stated:

"The Mountain Producers case was not decided on narrow, merely technical or presumptive grounds. Its very foundation was a repudiation of those insubstantial bases for securing broad private tax exemptions, unjustified by actual interfering or destructive effects upon the performance of obligations to or work for the government, state or national. The decision came as the result of experience and of observation of the constant widening of the exempting process from tax to tax to tax.

"Since that decision, as we have noted, the process has been reversed in direction. True intergovernmental immunity remains for the most part. But, so far as concerns private persons claiming immunity for their ordinary business operations (even though in connection with governmental activities), no implied constitutional immunity can rest on the merely hypothetical interferences with governmental functions here asserted to sustain exemption. In the light of the broad groundings of the Mountain Producers decision and of later decisions, we cannot say that the Gipsy Oil, Large Oil and Barnsdall Refineries decisions remain immune to the effects of the Mountain Producers decision and others which have followed it. They 'are

out of harmony with correct principle,' as were the Gillespie and Coronado decisions and, accordingly, they should be, and they now are, overruled. * * *

"We do not imply, by this decision, that Congress does not have power to immunize these lessees from the taxes we think the Constitution permits Oklahoma to impose in the absence of such action. The question whether immunity shall be extended in situations like these is essentially legislative in character. But Congress has not created an immunity here by affirmative action, and 'The immunity formerly said to rest on constitutional implication cannot now be resurrected in the form of statutory implication.' "

In the case of Esso Standard Oil Co. v. Evans (U. S. v. Evans), 345 U.S. 495, 73 S.Ct. 800, 802, 97 L.Ed. 1174, the Court stated:

"The Constitution does not extend sovereign exemption from state taxation to corporations or individuals, contracting with the United States, merely because their activities are useful to the Government. * * * "

The case of S. R. A., Inc. v. State of Minnesota, 327 U.S. 558, 66 S.Ct. 749, 753, 90 L.Ed. 851, involved property which had been owned by the United States but was later transferred to a private party who purchased from the United States under executory contract. The Court held that

the property was subject to the taxation of Minnesota. In this case, it is stated that the sovereignty of the United States ended with the reason for its existence and the disposition of the property. The transfer of property to non-federal hands is a relinquishment of the exclusive legislative power." We think the same relinquishment exists in the present case as to oil and gas. We do not think that our present finding is contra to the holding made in the case.

The cases of Yellowstone Park Transportation Co. v. Gallatin County, 9 Cir., 31 F.2d 644, certiorari denied 280 U.S. 555, 50 S.Ct. 16, 74 L.Ed. 611, and Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091, cited by the trial judge, from their facts are not apposite.

It is not necessary to discuss the case of Mater v. Holley, 5 Cir., 200 F.2d 123, cited by counsel for the plaintiffs, since its authority is the Surplus Trading Co. case, supra.

The Oklahoma case, supra, had one concurrence whereas the earlier cases had many dissents. We adhere to the modern trend so ably expressed in the above-quoted citations. It is so much easier to find fault with a remedy proposed for protection than to propose remedies for protection that are faultless.

So in the case at bar, the theoretical concept, advanced by plaintiffs, of immunity, like an alien thread, should be discarded, and only when the pattern is complete in a consideration of the law and the facts and the procedure taken as a whole is a true solution of the case possible.

The adoption of plaintiffs' contention by our learned brother of the district court would in the future operate as an unwise boycott against the right of the State of Louisiana to levy non-discriminatory severance taxes.

For these reasons,

The judgments of the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana, in these consolidated cases are reversed and set aside, and plaintiffs' suits are dismissed at their costs.

HAWTHORNE, J., dissents and assigns written reasons.

HAWTHORNE, Justice (dissenting).

I am of the opinion that the State of Louisiana is without power to levy and collect the taxes here involved, and that the judgment of the district court should be affirmed.

The lands on which the gas was gathered and from which the oil and gas were produced are a part of Barksdale Air Force Base, a military air base owned by the United States, and under the stipulation of facts and the exhibits attached these lands in my opinion are under the exclusive jurisdiction of the United States by virtue of the provisions of Article I, § 8, Clause 17, of the Constitution of the United States

and Louisiana Act No. 12 of 1898 as amended by Act No. 31 of 1942, in which the State of Louisiana surrendered and granted the right of exclusive jurisdiction to the United States.

Since the United States is vested with exclusive jurisdiction, the State is without power to levy and collect the taxes under the holding of the Supreme Court of the United States in the case of Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091. See also S. R. A., Inc., v. State of Minnesota, 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851.

I respectfully dissent.