AYRES, Judge.
In each of these cases, the respective plaintiff seeks to recover certain ad valorem taxes assessed and levied against it by the State of Louisiana and by its various taxing authorities, in Ward Two of Bossier Parish, Louisiana. The taxes which are sought to be recovered, in each instance, were paid by the plaintiff under protest, and thereafter these suits were instituted under the provisions of LSA-R.S. 47:2110.
The factual situation, identical as to plaintiffs Natural Gas and Oil Corporation and Mississippi River Fuel Corporation, is to be distinguished from that of the plaintiff, Humble Pipe Line Company. These differences will be noted in the course of this opinion. The same legal principles are, however, generally applicable to all three cases. The record made up on the trial consists of the testimony of Col. Alfred J. Hanlon, Jr., Base Commander of Barksdale Air Force Base, who appeared for the plaintiffs, taken by deposition pursuant to stipulation of the parties, and various documentary offerings and stipulation of counsel.
From a judgment rejecting its demands, each plaintiff has appealed to this court.
The United States of America acquired from the State of Louisiana, City of Shreveport, and the Board of Commissioners of the Bossier Levee District, in the year 1930, certain lands in Bossier Parish approximating 22,000 acres. The conveyances so made were admittedly donations, Shortly thereafter, Barksdale Air Force Base was constructed on a relatively small portion of that acreage and, since that time, the Government has continuously maintained and operated said base for military purposes.
Pertinent to the positions of Natural Gas and Oil Corporation and Mississippi River Fuel Corporation, it may be pointed out that, in 1951, it was determined that certain of the acreage within the total area acquired by the United States of America, as aforesaid, was being drained of minerals through wells drilled on privately owned adjacent lands; consequently, jurisdiction over 2,060 acres thereof was transferred to the Department of Interior with the provision there is to be no interference with the primary use of Barksdale Air Force Base.
By virtue of a lease of said property, executed by the Department of the Interior, Natural Gas and Oil Corporation drilled certain wells productive of oil and gas, which wells, with their equipment, have been assessed and levied upon for ad valorem tax purposes. (Natural Gas and Oil Corporation subsequently merged with the Mississippi River Fuel Corporation.)
As concerns the plaintiff, Humble Pipe Line Company, the taxes herein involved were imposed against two interstate oil trunk pipelines, of 8-inch and 10-inch diameters, respectively, belonging to this plaintiff and extending a distance of 2.91 miles within the acreage acquired by the United States of America, as aforesaid, which, however, are located not within the area covered by the oil, gas, and mineral leases held by the other two plaintiffs, but within the developed area or military reservation proper.
The sole question which is presented in these cases is whether or not the State of Louisiana, and its taxing authorities of Bossier Parish, may levy ad valorem taxes upon the privately owned properties of the respective plaintiffs, used and maintained by them for their commercial purposes, and situated within the enclosure of Barksdale Air Force Base. The plaintiffs contend that the State of Louisiana ceded its right to so tax such property within the said military reservation to the Federal Government and, consequently, now lacks such *577 power. At the very foundation of their claim, of course, is Article I, Section 8, Clause 17, of the Constitution of the United States, and Act 12 of 1892 of the Louisiana Legislature, embodied in LSA-R.S. 52:1. The constitutional provision reads as follows :
“The Congress shall have Power * -t *
“To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, * * * and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; * * (Emphasis supplied.)
The aforesaid legislative provision relied upon by the plaintiffs to support their claim of the State’s cession of the power to tax in these instances reads thus:
“The United States, in accordance with the seventeenth clause, eighth section of the first article of the Constitution of the United States, may acquire and occupy any land in Louisiana required for the purposes of the federal government. The United States shall have exclusive jurisdiction over the property during the time that the United States is the owner or lessee of the property. The property shall be exempt from all taxation, assessments, or charges levied under authority of the state.
“The state may serve all civil and criminal process issuing under authority of Louisiana on the property acquired by the United States.”
Of the total acreage acquired by the United States of America, in the year 1930, as aforesaid, the cantonment area of Barks-dale Air Force Base covers about 1,000 to 1,500 acres, and an additional improved part of the base, which includes the airfield proper, comprises another 1,500 acres, leaving about 19,000 acres of unimproved land known as the East Reservation. It is in this last-mentioned area that Natural Gas and Oil Corporation and Mississippi River Fuel Corporation have their physical properties against which the ad valorem taxes have been assessed and levied.
Moreover, in Murphy Corp. v. Fontenot (S.Ct., 1954), 225 La. 379, 73 So.2d 180, 183, it was established that this land was set apart from the land used for the governmental purposes of the Air Force Department; in fact, there was a dividing fence between the oil field and the Air Force Base. The court there said:
“These private owners were granted the right of use and control over all instrumentalities, owned and constructed by them, such as drilling machines, towers, tanks and pipe lines for their private commercial purposes to explore for oil and gas and to reduce such to private ownership.”
In other words, the instruments employed by the private businesses, Natural Gas and Oil Corporation and Mississippi River Fuel Corporation, were entirely and exclusively within their own control. It might be emphasized that the land covered by the lease operations is only remotely related to the primary use of the reservation for military purposes. This was made so obvious in the Murphy Corporation case, supra, that the late Justice Moise, as organ of the court, found it necessary to say:
“ * * * the land leased was not to be used for the erection of a fort, magazine, arsenal, dock-yard or other needful buildings for military purposes.”
The tax was not one imposed upon, or in any way affecting, property or functions of the Federal Government. In Fort Leavenworth R. R. Co. v. Lowe, 114 U.S. *578 525, 5 S.Ct. 995, 1002, 29 L.Ed. 264, 269, the Supreme Court of the United States clearly recognized the residual power of the State to tax in instances where the Federal Government does not use places acquired in the execution of its own powers. Thus, it was stated:
“Where, therefore, lands are acquired in any other way by the United States within the limits of a state than by purchase with her consent, they will hold the land subject to this qualification : that if upon them forts, arsenals, or other public buildings are erected for the uses of the general government, such buildings, with their appurtenances, as instrumentalities for the execution of its powers, will be free from such interference and jurisdiction of the state as would destroy or impair their effective use for the purposes designed. Such is the law with reference to all instrumentalities created by the general government. Their exemption from state control is essential to the independence and sovereign authority of the United States within the sphere of their delegated powers. But, when not used as such instrumentalities, the legislative power of the state over the places acquired will be as full and complete as over other places within her limits.” (Emphasis supplied.)
Plaintiffs Natural Gas and Oil Corporation and Mississippi River Fuel Corporation contend that neither the Murphy Corporation case, supra, certiorari denied by Supreme Court of the United States, 348 U. S. 831, 75 S.Ct. 54, 99 L.Ed. 655, nor Mississippi River Fuel Corporation v. Fontenot (C.C.A. 5), 234 F.2d 898, certiorari denied by Supreme Court of United States, 352 U. S. 916, 77 S.Ct. 213, 1 L.Ed.2d 122, is appropriate because they involved gas gathering and severence taxes decided on principles not applicable to these cases. Despite the differences in the type of taxes involved, the principles as regards the jurisdiction of the State to tax are the same. It may be noted, too, that the provisions of the leases in the instant cases, imposing obligations on the lessees to pay taxes, are substantially the same as contained in the leases concerned in the cited cases.
The language employed in the Murphy Corporation case is pertinent to the issues here. There, the court stated:
“The acceptance * * * by the Secretary of War states that the property is to be used for military purposes. When the Secretary of War transferred certain portions of the land to the Department of the Interior, and the Commandant of the Air Base certified that such leases would not interfere with the governmental operations of the Air Base, we had a splendid affirmative of the position taken by the State.
“In the operation of the oil field, the lessees were not militarily engaged. The fugitive oil and gas when captured did not belong to the Federal Government but to private owners. No severance tax is levied against the Government nor is there any tax levied on the lands or the instrumentalities of the Federal Government.”
Similarly, in these instances, there is no tax levied against the Federal Government or any of its instrumentalities or property. In this connection, what was said by the Supreme Court of the United States in Esso Standard Oil v. Evans (United States v. Evans), 345 U.S. 495, 73 S.Ct. 800, 97 L.Ed. 1174, is pertinent, to-wit:
“The Constitution does not extend sovereign exemption from state taxation to corporations or individuals contracting with the United States, merely because their activities are useful to the Government.”
As to plaintiffs Natural Gas and Oil Corporation and Mississippi River Fuel Corporation, the provisions of the lease are the law of the case (Murphy Corp. v. Fontenot, supra). Under the terms of the lease agreement, in Section 2, under Rentals *579 and Royalties, (7) (K), the lessee is required
“To pay when due, all taxes lawfully assessed and levied under the laws of the State or the United States upon improvements, oil and gas produced from the lands hereunder, or other rights, property, or assets of the lessee; to accord all workmen and employees complete freedom of purchase, and to pay all wages due workmen and employees at least twice each month in the lawful money of the United States.”
The contentions of Murphy Corporation in the cited case were disregarded in the following language:
“To follow the plaintiffs’ contentions, we must give no effect to the mandatory provisions of Section 2(7) (K) of the lease in question, and we must likewise say that such a provision together with the pertinent authorities on Constitutional questions by the courts are mere abstractions affording no real protection.”
Moreover, in the Mississippi River Fuel Corporation case, supra, answering the taxpayer’s contentions with regard to the lease provision, the Fifth Circuit, Court of Appeal, said:
“Putting to one side all the refinements which have attended the long struggles over jurisdiction, as instanced in the cases, and over the effort to throw over private operations the protective mantle of governmental immunity, all that is presented for decision in this case is whether a severer of oil and gas, who, if he had taken it from any other land in the state, would unquestionably be liable under the general laws of the state for the severance tax, can carve out of the fact, that it came from land which was a part of Barksdale Field, an exemption for himself against having to pay the tax on severing the oil and gas from the surface and appropriating it to his own use. For the same reason that the statute under which the exaction is made is a general excise statute, not directed at any particular person or property but at all persons who are severers, it cannot be said that the provision in the lease obliging the lessees, as one of the considerations for it, to pay the taxes, was not fully effective.”
These plaintiffs in the instant cases cannot clothe themselves with the mantle of governmental immunity any more so than could the Murphy Corporation in the cited case in the State Court, or the Mississippi River Fuel Corporation in the cited case in the Federal Court. Their sole claim to immunity is the fact that their physical properties are situated within the enclosure of Barksdale Air Force Base. This can afford them no such immunity. The lease provisions are effective to insure payment by these plaintiffs of the ad valorem taxes imposed upon their physical properties.
The circumstances evidence the intention of the United States not to accept exclusive jurisdiction over the area donated for Barksdale Air Force Base. In International Business Machines Corporation v. Ott (S.Ct., 1956), 230 La. 666, 89 So.2d 193, there was involved a question of whether or not the State could levy ad valorem taxes on certain business machines owned by the plaintiff, but leased to the Federal Government, and situated at a site over which jurisdiction had been ceded to the United States. As organ of the court, on rehearing, Chief Justice Fournet said:
“The view of presumed acceptance of ceded jurisdiction, which was followed in certain cases, was subjected to a thorough re-examination in two suits presented to the Court in the term beginning October, 1937: James v. Dravo Contracting Company, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, and Silas Mason Co. v. Tax Commission, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187.”
*580 In the Dravo case, immunity from a West Virginia “annual privilege tax” based on gross receipts was sought by a Pennsylvania contractor with .respect to sums collected under contracts with the United States Government for the building of structures within West Virginia. One of the issues was the territorial jurisdiction of the State to impose the tax as to work done on property acquired by the Federal Government. In the cited case, the United States Supreme Court held that the tax is not laid upon the Government, its property, or officers, nor upon an instrumentality of the Government, nor yet upon the contract of the Government, and stated:
“The application of the principle which denies validity to such a tax has required the observing of close distinctions in order to maintain the essential freedom of government in performing its functions, withoitt unduly limiting the taxing power which is equally essential to both nation and state under our dual system.”
In the Silas Mason case, a similar tax was involved and the question there was whether certain of the areas in which the contractors’ work was performed were within the exclusive jurisdiction of the United States, in view of the acquisition by the United States and the provisions of the State statute. The court there stated:
“The mere fact that the Government needs title to property within the boundaries of a State * * * does not necessitate the assumption by the Government of the burdens incident to an exclusive jurisdiction.”
Our State Supreme Court ultimately concluded, in the International Business Machines case, supra, that the acceptance of services furnished by the City of New Orleans to the sites in question manifested an intent on the part of the Government not to accept exclusive jurisdiction. The court made this appropriate observation:
“The fact that the Legislature of a State has ceded exclusive jurisdiction is not the controlling consideration; reference must be had to the circumstances of the case, which may well be evidence of intention on the part of the United States not to accept the grant. In the instant case it was shown that various services (fire protection, sewerage, water and drainage facilities, police traffic regulation) furnished by the City of New Orleans were used by the various locations, and that the United States has failed to indicate an intention to exercise control in those respects; in fact, the acceptance of such services manifested a contrary intent on the part of the Federal Government. Silas Mason Co. v. Tax Commission of Washington, supra. We think, upon further analysis and study, that the rule of Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 456, 74 L.Ed. 1091, it [sic] not to be applied to the instant factual situation. In that case the U. S. Supreme Court was careful to point out that Camp Pike came directly within the words, ‘ “forts, magazines, arsenals, dockyards, and other needful buildings” ’ of the constitutional provision, which decreed ‘ “exclusive legislation in all cases whatsoever” over a place so purchased for such a purpose.’ ”
The testimony shows conclusively that, just as in the International Business Machines Corporation case, supra, the Federal Government, in the operation of Barksdale Air Force Base, is dependent upon the State and Parish authorities for public utilities and school facilities. The fact that it purchases these utilities at the gate to the reservation or that the Federal Government pays to the parish school system a per capita charge for each child of a serviceman attending its schools would not have the effect of making the Federal Government any less dependent upon the State and Parish authorities for these services. Just as. in the International Business Machines-Corporation case, the acceptance of such-services has manifested an intent on the part *581 of the Federal Government not to exercise control in those respects.
Although the land traversed by plaintiff Humble Pipe Line Company’s lines is not a part of the East Reservation of Barksdale Air Force Base, the portion of which is covered by the oil, gas, and mineral lease, or leases, involved in the companion cases, we may point out that the lease provision, Section 2, under Rents and Royalties, (7) (K), which imposed upon the lessee the obligation to pay all State taxes, evidences an intention of the United States not to accept exclusive jurisdiction over the property embraced within the limits of the base. This plaintiff cannot clothe itself with the mantle of governmental immunity any more so than could the Murphy Corporation in the cited case in the State Court or the Mississippi River Fuel Corporation in the cited case in the Federal Court. Its sole claim to immunity is the fact its physical property is situated within the enclosure of Barksdale Air Force Base. This can afford it no such immunity.
Plaintiff Humble Pipe Line Company is vested with a servitude across the lands of Barksdale Air Force Base under which its lines pass. The existence of this real right evidences an imperfect ownership of the Government in the area traversed by the pipelines. Thus, as to the area subjected to the servitude, the Government possesses only the naked ownership.
LSA-C.C. Art. 490.
In the case of S. R. A., Inc. v. Minnesota (1946), 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851, Mr. Justice Reed, as the author of the opinion, said:
“This Court apparently has never directly passed upon the effect on federal sovereignty of the property’s transfer by the United States to private hands. * * *
“There was no requirement in the act of cession for return of sovereignty to the state when the ceded territory was no longer used for federal purposes. In the absence of some such provisions, a transfer of property held by the United States under state cessions pursuant to Article I, Section 8, Clause 17, of the Constitution would leave numerous isolated islands of federal jurisdiction, unless the unrestricted transfer of the property to private hands is thought without more to revest sovereignty in the states. As the purpose of Clause 17 was to give control over the sites of governmental operations to the United States, zvhen such control was deemed essential for federal activities, it would seem that the sovereignty of the United States would end with the reason for its existence and the disposition of the property. We shall treat this case as though the Government’s unrestricted transfer of property to nonfederal hands is a relinquishment of the exclusive legislative power.” (Emphasis supplied.)
In that case, there was held to be a relinquishment of jurisdiction despite the fact that there was only an executory contract of sale with title remaining in the Government. Here, either the Government took the lands donated to it subject to the plaintiff’s existing right of servitude, or a grant of right of way was made to the plaintiff by the Government. The record does not show which was the case. Obviously, the Government acquired an imperfect title, or else it became vested with an imperfect title as to the lands traversed by the lines upon the grant of such a right of way. It either never acquired exclusive jurisdiction over the same o.r else, under the authority of the S. R. A. case, it relinquished same.
For the aforesaid reasons, the conclusion appears inescapable that the taxes imposed in these instances are against private property owned and possessed by plaintiffs, under their control and used by them in the conduct of their commercial businesses; that the taxes are not levied against the United States of America, nor against any of its property or against any of its agencies *582 or instrumentalities; and that the State and its taxing authorities have jurisdiction to levy and impose such taxes.
The judgments appealed are accordingly affirmed at the cost of each of the plaintiffs in its respective suit.
Affirmed.