hLOBRANO, Judge.
This case originated in the Board of Tax Appeals as a result of four assessments by the Department of Revenue (the Department) against Shell Oil, Shell Western E & P, Inc. and Shell Offshore, Inc. (Shell). Although consolidated by the Board of Tax Appeals for hearing, the four assessments involve two unrelated issues.
In proceedings numbers 3392 and 3393, the Department assessed Shell for severance taxes on natural gas production for the periods January 1980 through December 31, 1986.[1] The issue in those eases revolves *1028 around a gas purchase agreement between Shell and Creole Gas Pipeline executed August 13, 1964. For ease of reference, we refer to those two cases as the contract dispute.
In proceedings numbers 3394 and 3395 the Department assessed Shell for the period January 1980 through February 1986 for severance taxes on oil and gas production on Barksdale Air Force Base in Shreveport, Louisiana.[2] The issue |¾⅛ those cases involves the authority of the State to’ levy and collect severance taxes on wells located within the confines of Barksdale, a federal enclave. For ease of reference, we refer to those two cases as the Barksdale dispute. The severance tax assessment in the contract dispute does not involve any natural gas production involved in the Barksdale dispute.
Shell was successful before the Board of Tax Appeals on all issues. All assessments against Shell, save for those stipulated to be owing, were dismissed. The Department sought review in the Civil District Court for the Parish of Orleans. The District Judge reversed the Board of Tax Appeals in the Barksdale dispute and affirmed the decision in the contract dispute.
Shell appeals the decision in the Barksdale dispute and the Department answers, seeking an increase in attorney fees.[3] The Department appeals the decision in the contract dispute seeking reversal of the trial court’s and Board of Tax Appeals’ decision which rejected the Department’s assessments. We will discuss each dispute separately.

BARKSDALE DISPUTE:

The issue in the Barksdale dispute is whether or not the State of Louisiana has the authority to impose a severance tax on oil and gas produced from wells located within the confines of Barksdale Air Force Base. The thrust of Shell’s position is that Barks-dale is a federal enclave subject to the exclusive jurisdiction of the United States and therefore Louisiana is without authority to hlevy the severance taxes at issue. In support, Shell relies on Article I, Section 8, Clause 17 of the United States Constitution which provides in pertinent part:
“The Congress shall have Power ... To exercise exclusive Legislation in all Cases whatsoever ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-yards, and other needful Buildings .... ”
The majority of Shell’s brief and argument, however, is devoted to rebutting the various arguments advanced by the Department as to why Louisiana is not barred from imposing the severance tax.
The Department advances two basic arguments in support of its position. First it argues that the provisions in the Mineral Lands Leasing Act of 1920 and the Federal Leasing of Acquired Lands Act of 1947, including its 1976 amendment, constitute congressional approval of the State’s taxing authority within federal enclaves. Second, it asserts that the Buck Act, 4 U.S.C. 106, also modified the exclusive jurisdiction of Article I, Section 8, Clause 17 to the extent that States may levy an income tax on transactions occurring within a federal enclave. For the following reasons, we affirm the trial court on this issue.
Without going into great detail about the history of Barksdale Air Force Base, suffice it to say that in 1930, the State of Louisiana, the City of Shreveport and the Bossier Levee District donated approximately 22,000 acres of land to the United States for the purpose of a military post. The legislation authorizing the transfers recognized the exclusive *1029 jurisdiction of the United States. See, La. R.S. 52:1. In 1961, pursuant to Public Land Orders 701 and 2178, the Secretary of the Interior leased certain lands within the confines of Barksdale to UShell.[4] Production from those leases is the basis for the severance taxes at issue in this appeal.
Numerous decisions in both the federal and state judicial systems have addressed and decided the issue now confronting this court. Initially, in the 1954 case of Murphy Corp. v. Fontenot, 225 La. 379, 73 So.2d 180 (1954), cert. denied, 348 U.S. 831, 75 S.Ct. 54, 99 L.Ed. 655 (1954), the Louisiana Supreme Court held that Louisiana could impose severance taxes on production from Barksdale because the lands subject to the mineral leases were no longer needed for military purposes and hence were not protected from state taxation by virtue of Article I, Section 8, Clause 17. The rationale of the Murphy ease was followed in the federal system in Mississippi River Fuel Corporation v. Fontenot, 234 F.2d 898 (5th Cir.1956), cert. denied, 352 U.S. 916, 77 S.Ct. 213, 1 L.Ed.2d 122 (1956).
In 1964, however, the U.S. Supreme court decided Humble Pipe Line Company v. Waggonner, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964). In that case, the issue was the authority of the State to levy ad valorem taxes on pipelines and other oil field equipment located within the confines of Barksdale Air Force Base. Louisiana advanced the same argument it had successfully advanced in Murphy Corp. v. Fontenot, i.e., once mineral leases were granted by the federal government, the property subject to those leases was no longer used for military purposes, and hence exclusive federal juris1 diction ceased. The Supreme Court rejected that argument. It held that exclusive federal jurisdiction was not|glost by the issuance of a mineral lease and that there was no evidence to suggest that the government did not need to keep the land intact and ready for military use.
Recognizing that Humble Pipe Line Co. v. Waggonner overruled the rationale of Murphy Corp. v. Fontenot, the U.S. Fifth Circuit, in Mississippi River Fuel Corporation v. Cocreham, 382 F.2d 929, (5th Cir.1967), on rehearing 390 F.2d 34 (5th Cir.1968), cert. denied, 390 U.S. 1014 and 1015, 88 S.Ct. 1264, 20 L.Ed.2d 164 (1968), held that:
“The argument that in its sovereign capacity Louisiana has the power to impose a tax on the severance of oil and gas in a federal enclave collides with the Supremacy Clause. As Humble holds, a State may not legislate for a federal enclave within the exclusive legislative jurisdiction of Congress.” 390 F.2d at 36.
The court also rejected the argument that the Buck Act, 4 U.S.C. 104-110, which permits a state to levy an income tax in a federal enclave, was applicable to Louisiana’s severance tax. The Court’s reasoning was premised on the fact that severance taxes were collected on the quantity of oil and gas produced and not on income and thus Louisiana’s severance tax was not an income tax.
Sixteen years later, in MRT Exploration Co. v. McNamara, 94-0063 (La.App. 1st Cir. 12/29/94), 648 So.2d 1108, writ granted in part; denied in part, 95-0565 (La. 5/19/95), 654 So.2d 1083; cert. denied, — U.S. -, 116 S.Ct. 192, 133 L.Ed.2d 128 (1995),. our brethren of the First Circuit held that Louisiana could levy its severance tax on oil and gas produced from Barksdale. The court set forth two reasons in support of its holding. First, it concluded that because the tax on oil and condensate was now based on value rather than quantity, it fell within the definition of an income tax within the meaning of the Buck Act. Second, because the 1976 amendments to the Mineral Leasing Act of 1947[5] did away with the previous exclusion of military | abases, the leasing of the lands comprising Barksdale Air Force Base was governed by the provisions of the Act. In particular, *1030 the court relied on section 8 (30 U.S.C. 357) which reserved to the states “the right to levy and collect taxes upon [the] output of mines....”
Two significant changes in the law subsequent to the Fifth Circuit decision in Mississippi River Fuel Corporation v. Cocreham convince us that MRT Exploration Co., supra, is correct. First, the Louisiana legislature, in the 1973 extraordinary session, amended the severance tax laws to provide that the tax on oil, condensate and distillate be computed on its value rather than quantity. Second, in 1976 the Mineral Leasing Act for Acquired Lands was amended to remove the military base exclusion. 30 U.S.C. 352. For the reasons assigned in MRT Exploration Co. and for the following additional reasons, we hold that Louisiana is not prohibited by Article 1, Section 8, Clause 17 of the U.S. Constitution from levying and collecting severance taxes on minerals produced from wells within the boundaries of Barksdale Air Force Base.
After reviewing the jurisprudence outlined above, as well as the various constitutional and statutory provisions cited by both parties, we are satisfied of the following facts and conclusions. Barksdale Air Force Base is a federal enclave within the meaning of Article 1, Section 8, Clause 17 of the U.S. Constitution. Humble Pipe Line Co. v. Waggonner, supra. However, Congress may authorize states to exercise jurisdiction within a federal enclave, the Buck Act being an example of such authorization. That act permits the states to levy an income tax within a federal enclave and defines an income tax as “any tax levied on, with respect to, or measured by, net income, gross income, or gross receipts.” 4 U.S.C. 110(c). The receipts or income must be derived from transactions which Roccur on the base. 4 U.S.C. 106. The severance tax on oil, distillate and condensate is based on its value rather than its quantity, and is derived from transactions occurring on the base and is therefore an income tax within the meaning of the Buck Act.
Although the court in Humble Pipe Line Co. and Cocreham cited the Buck Act as one example of a Congressional exemption to the exclusive U.S. jurisdiction in federal enclaves, we are satisfied that the 1976 amendment to the Mineral Leasing Act for Acquired Lands also falls within the same category. The Mineral Leasing Act for Acquired Lands was initially enacted in 1947 to provide for the leasing of those federal lands not covered by the Mineral Leasing Act of 1920. The 1947 Act applied to acquired lands, while the 1920 Act applied to public domain lands. Section 8 of the 1947 Act provides that “[njothing contained in this Chapter shall be construed to affect the rights of the State ... to levy and collect taxes upon ... [the] output of mines ... of any lessee of the United States.” 30 U.S.C. 357. Initially, Section 3 of the Act excluded military bases from its coverage. However, as we previously noted, in 1976 Section 3 was amended to include those bases. 30 U.S.C. 352. A complete reading of the act in its present form leads us to the conclusion that Congress intended, by the 1976 amendment, to permit the states to collect severance taxes on minerals produced on military bases.
We are mindful of Shell’s arguments that the mineral leases at issue in this case were not executed pursuant to either the Mineral Leasing Act of 1920 or the Act of 1947, and thus the 1976 amendment is inapplicable to Barksdale. However, we disagree with the underlying premise that the mineral leases are not governed by the 1947 Act. When Shell obtained its lease in 1961, neither the Isl920 Act nor the 1947 Act provided authority for the granting of a mineral lease on Barksdale Air Force Base.[6] The Public Land Orders, which authorized the Secretary of the Interior to lease the lands, originated with an opinion of the U.S. Attorney General in 1941. That opinion, written prior to the 1947 Act, recognized that acquired lands, such as Barksdale, were not subject to the 1920 Act, and therefore an executive order was needed to authorize protective leasing by *1031 an agency other than the military department. The Department of Interior was that agency. Consequently, if the 1947 Act had not originally excluded military bases or if the 1920 Act had included acquired lands, President Roosevelt’s executive order and the Public Land Orders would not have been necessary. Barksdale could have been leased pursuant to either of those acts. And, since each act specifically recognized a state’s right to levy a tax on mineral output, even though it is a federal enclave, production on Barksdale Air Force Base would have been subject to Louisiana’s severance tax. When the 1976 amendment brought military bases within the leasing provisions of the 1947 Act, the necessity of public land orders as authority for leasing ceased. The Act provided that leasing authority. Federal leases on acquired lands were governed by that Act, which has always permitted states to levy severance taxes. The removal of the military base exclusion from the 1947 Act brought Shell’s leases within the purview of that Act and was Congress’ authorization to levy severance taxes on mineral production from Barksdale.
1 (¿CONTRACT CASES:
During the 1973 extra session of the Louisiana legislature, the severance tax on natural gas production was increased from 3 cents [7] per mcf to 7 cents per mcf, effective January 1, 1974. La.R.S. 47:633(9). During the same session, the legislature enacted La. R.S. 47:633.1 which provides, in paragraph A, as follows:
“Notwithstanding the provisions of R.S. 47:633(9) to the contrary, the tax on gas severed from the soil or water and sold at a rate less than that authorized as the area ceiling rate by order of the Federal Power Commission under a written agreement in existence prior to May 1, 1972, which requires the seller to pay and bear all of the severance tax on gas without reimbursement of any portion thereof, shall not exceed 3.0 cents per thousand cubic feet during the existence of such contract.”
On August 13, 1964 Shell entered into a gas sales contract with Creole Gas Pipeline Corporation (Creole) wherein Shell was obligated to supply gas to Creole from July 1, 1965 to June 30,1990 at a fixed price without benefit of any reimbursement for severance taxes. The contract volume was set at the lesser of one-half of the buyer’s needs[8] or 15,000,000 cubic feet a day. The contract also provided that Shell would be obligated to furnish an additional 7,500,000 cubic feet a day upon receiving six months notice from Creole. The contract price was less than the Federal Power Commission’s ceiling rate of 22.375 cents per mcf.[9] | ipThus, gas sold by Shell pursuant to its contract with Creole fell within the exemption granted in R.S. 47:633.1(A).
By letter agreement dated April 4, 1975 Shell agreed to supply the additional 7,500,-000 cubic feet of gas per day called for in the contract at a price of $1.40 per mcf. There being no doubt that the price on this additional gas was in excess of the ceiling rate, Shell paid severance taxes on this additional gas at the rate of 7 cents per mcf.
The Department of Revenue, however, takes the position that modifications to the original August 13, 1964 contract, including fixing the price of the additional gas, removed the contract from the provisions of R.S. 47:633.1(A) and requires a tax of 7 cents per mcf on all of the gas sold thereunder. The Department argues that if a weighted average price is computed on all of the gas sold pursuant to the contract, that weighted average exceeds the ceiling rate (22.375 cents) set by R.S. 47:633.1(A), and thus the higher rate of 7 cents per mcf, is applicable.
*1032 The Board of Tax appeals rejected the Department’s position and the trial court affirmed. The thrust of the trial court’s opinion is as follows:
“It is this Court’s view that the modification to require the Respondents to provide more gas to their vendee is a material alteration of the contract, but only with respect to the option gas. Respondents essentially entered into a new contract for the additional gas only and thus became obligated to pay the increased severance tax on the additional gas only. It appears that the Legislature did not intend to affect existing contractual gas, only additional gas above area ceiling rates.” (emphasis added)
We agree with the trial court. Shell was obligated under the contract of August 13, 1964, to provide an additional 7,500,000 cubic feet per day if requested by Creole. The price of this additional gas was not fixed in the original Incontract, but was set by subsequent letter agreement. That subsequent agreement did not affect nor modify the price of the initial 15,000,000 cubic feet Shell was obligated to supply. Despite the Department’s contrary arguments, we cannot interpret legislative intent to require a weighted price for all gas delivered under the contract. The most reasonable interpretation is that whatever volume Shell is obligated to supply at a price below the ceiling rate and without reimbursement for severance taxes, then that volume is subject to severance taxes at the rate of 3 cents per mef.[10]
We also reject the Department’s argument that the contract was so altered, amended or modified as to remove it from the statutory exemption of R.S. 47:633.1(A). Without detailing each and every instance of alleged modification relied on by the Department, suffice it to say that the only one of any material consequence was the letter of April 4, 1975 wherein the price for the additional gas was set. Shell paid the higher severance taxes on that additional gas. The other modifications cited in brief by the Department do not alter or affect Shell’s obligation to provide the initial 15,000,000 cubic feet of gas at a fixed price. For example, there was an assignment of the contract from Shell Oil to Shell Offshore, an assignment from Creole to Air Products & Chemicals, Inc., an amendment to the April 4, 1975 letter agreement providing for a mutual price increase or decrease on the additional gas, and a transportation agreement between Tennessee Gas Pipeline and Shell Oil. None of these alleged modifications affected Shell’s | i2basic obligation to absorb the severance tax on the initial 15,000,000 cubic feet of gas supplied.
The contract between Shell and Creole was an arms length business deal the parties entered into long before the legislature raised the severance tax rate. In an effort to give relief to those gas suppliers who, by contract, could not absorb or pass on the added increase in severance taxes, the legislature adopted R.S. 47:633.1(A). That statute is applicable to the quantity of gas sold pursuant to Shell’s contract and at a price less than the statute’s ceiling rate.

ATTORNEY FEES:

In the Barksdale dispute, the Department was initially awarded attorney fees of 10% on the total taxes and interest due pursuant to La.R.S. 47:1512. By amended judgment rendered August 14, 1995 and signed September, 1995 the trial court reduced the award to $150,000.00.
The Department answered the appeal in the Barksdale dispute. Based on our review of its brief, particularly footnote eight, the Department is only seeking additional fees for the appellate portion of this case. No argument is made about the trial court’s amended judgment awarding $150,000.00.
*1033 La.R.S. 47:1512 provides the statutory authority for the imposition of attorney fees when taxes are found to be due. The award of fees pursuant to that statute is subject to a standard of reasonableness. City of Baton Rouge v. Stauffer Chemical Co., 500 So.2d 397 (La.1987). Legal fees “are subject to judicial scrutiny on a case by case basis regarding whether the attorney fees as mandated by law are reasonable and not excessive under the circumstances.” Id. at 401.
li3Shell argues the $150,000.00 awarded by the trial court is sufficient to encompass the appellate work done by the Department’s counsel.
The trial court made it clear that its award did not include appellate work. We therefore increase the award by $10,000.00.
For the reasons assigned, the judgment of the trial court is amended to increase the award of attorney fees to $160,000.00. In all other respects, the judgment is affirmed.
AMENDED AND AS AMENDED, AFFIRMED.

. The assessment for the period January 1980 through December of 1981 is against Shell Oil *1028 Company. The assessment for the period January 1982 through December 1986 is against Shell Offshore, Inc. Shell stipulated to the correctness of the Department's assessments for the months of November and December of 1985, and January, 1986.

. The assessment' for the period January 1980 through December of 1983 is against Shell Oil Company. The assessment for the period January 1984 through February 1986 is against Shell Western E & P, Inc.

. The judgment in the Barksdale litigation provided for 10% attorney fees as authorized by La.R.S. 47:1512. That amount was reduced by amended judgment to $150,000.00. The Department seeks an increase for the additional work necessitated by this appeal.

. The jurisdiction over the mineral deposits was transferred from the Department of the Air Force to the Interior Department to facilitate the leasing of same. The leases issued are styled “Protective Lease” presumably to prevent drainage of the oil and gas by neighboring wells. For a complete historical analysis of the leasing authority of the Department of the Interior see Murphy Corp. v. Fontenot, 73 So.2d 180 (La.1954).

. 30 U.S.C. 351-359.

. The 1920 Act only applied to public domain lands and the 1947 Act, although applicable to acquired lands, excluded military bases.

. Actually, the prior rate was 3.3 cents per mcf. However, in brief, the parties refer to the rate as 3 cents, which is consistent with R.S. 47:633.1(A).

. Actually, Creole was supplying gas to Air Products and Chemicals, Inc. The contract's volume was the lesser of one-half of Air Product’s needs or 15,000,000 cubic feet a day.

.Federal Power Commission order 598 set the ■ ceiling rate for the South Louisiana area at 22.375 cents per mcf. The contract price varied from 17.5 cents per mcf for the first two years to 21.75 cents for the last year. However, all were less than the ceiling rate.

. Of relevance to this position is La.R.S. 47:633.1(C) wherein the legislature, in 1990 when severance taxes were again raised from 7 cents to 10 cents, specifically provided for an exemption based on the position we now take. That is, gas sales were apportioned, for severance tax purposes, according to the price received. Arguably this subsequent statute, because it is not applicable to the case before us, should not be considered. However, we cannot ignore the fact that the legislature apparently saw the possibility of a misinterpretation of paragraph A and sought to avoid the problem in paragraph C.