662 So.2d 498 (1995)
Janette M., wife of/and Charlie KORNMAN, Individually and on Behalf of Their Dependent Son, Richard Jay Kornman
v.
BLUE CROSS/BLUE SHIELD OF LOUISIANA.
No. 94-CA-306.
Court of Appeal of Louisiana, Fifth Circuit.
September 26, 1995.
Rehearing Denied November 17, 1995.
*499 David C. Loeb, Jack E. Morris, Molaison, Price & Loeb, LLP, Metairie, Marion F. Edwards, Gretna, for plaintiffs-appellees.
Sylvan J. Steinberg, Robin H. Graves, Bronfin & Heller, New Orleans, for defendant-appellant.
Before GRISBAUM, WICKER and GOTHARD, JJ.
GRISBAUM, Judge.

INTRODUCTION
Defendant appeals from the trial court's judgment finding plaintiffs were entitled to benefits for Richard Kornman's 11-month confinement/treatment for drug abuse under the health insurance policy provided by defendant along with penalties and attorney's fees. We affirm.

ISSUES
1. Whether the Coast Quality Construction Company's (Coast) Medical Expense Plan (MEP) is a plan under the Employee Retirement Income Security Act (ERISA);
2. Whether Richard Kornman was covered as a dependent under Coast's MEP;
a. Whether Richard was capable of self-support;
b. Whether Charlie Kornman was required to provide proof of Richard's incapacity and dependency when Richard reached age 25, the limiting age;
c. Whether Blue Cross could have denied Richard's coverage based on information in a health questionnaire;
*500 3. Whether Richard Kornman's treatment at the Coliseum was covered by the terms of the policy;
a. Whether Richard's treatment at the Coliseum fell during the 365-day exclusion period for pre-existing conditions;
b. Whether Richard was treated for substance abuse or for a mental condition for which there is a policy limit of $5,000;
c. Whether Richard's treatment at the Coliseum Medical Center was medically necessary.

FACTS
Plaintiffs, Charlie, Janette and Richard Kornman[1], filed suit in state court in June 1988 against Blue Cross/Blue Shield of Louisiana[2] (Blue Cross), seeking medical benefits allegedly owed them under a medical expense plan (MEP) established by their employer, Coast Quality Construction Company (Coast), and insured by defendant. Charlie Kornman was both the owner and an employee of Coast.
Plaintiffs seek recovery for medical expenses incurred by Richard Kornman during an eleven-month stay at the Coliseum Medical Center ("Coliseum"), for treatment for substance abuse. Plaintiffs maintain Richard was covered as a dependent under Charlie Kornman's policy. Alternatively, plaintiffs maintain Richard was covered independently as an employee of Coast. Blue Cross denied coverage under both assertions.
Blue Cross attempted to remove the matter to federal court on the basis ERISA governed but the Eastern District Court found there was no ERISA plan and remanded the matter to the state court. After a sporadic four day trial, the trial court found ERISA did not apply, Richard was covered by Blue Cross as Charlie's dependent and was, accordingly, owed benefits. The trial court awarded plaintiffs $174,423.64 for benefits, $37,940.25 for attorneys' fees, $174,423.64 in penalties, $16,351.02 in costs and expert fees, plus interest. Blue Cross appeals this judgment on several grounds.

ISSUE ONE: Is Coast's MEP an ERISA plan?
On July 21, 1988, defendant-appellant filed a petition of removal on the basis plaintiffs' cause of action for the recovery of benefits under Coast's medical expense plan (MEP) was governed by ERISA and, thus, a federal question existed for federal court jurisdiction. The United States District Court for the Eastern District of Louisiana remanded the matter finding Coast's MEP did not qualify as an ERISA plan under Taggart Corp. v. Life & Health Benefits Admin., 617 F.2d 1208 (5th Cir.1980), cert. denied, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).[3]
On remand, appellant reurged its argument to the state trial court that ERISA applied. Adopting the reasons set forth in the Eastern District Court's order, the trial court likewise found ERISA did not apply.
On appeal, despite the findings of both the Eastern District Court and the state trial court, Blue Cross continues to assert ERISA governs this case.[4] Blue Cross bases its argument on recent federal Fifth Circuit cases[5], decided after the 1988 Eastern District *501 Court's order of remand, which severely restrict Taggart Corp. v. Life & Health Benefits Admin., supra, the sole case relied on by both the Eastern District Court and the trial court in determining Coast's MEP was not an ERISA plan. Blue Cross asserts Coast's MEP would qualify as an ERISA plan under the guidelines established by these new federal cases. However, plaintiffs argue the new federal cases cannot be retroactively applied because to do so would divest them of a vested right, namely the right to penalties and attorney's fees, given to them as a matter of state law.[6]
In matters involving federal law, we, as a state court, are only "bound" by decisions of the United States Supreme Court. Gaspard v. Transworld Drilling Co., 468 So.2d 692 (La.App. 3 Cir.1985), writ denied, 474 So.2d 1304 (La.1985), cert. denied, 475 U.S. 1067, 106 S.Ct. 1382, 89 L.Ed.2d 607 (1986). Federal appellate court decisions, such as decisions rendered by the Federal Fifth Circuit, are merely persuasive. State v. White, 321 So.2d 491 (La.1975). As a state court, we have authority to render decisions based on our own interpretation of federal law provided federal courts do not have exclusive jurisdiction over the matter. ASARCO Inc. v. Kadish, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). Thus, since we share concurrent jurisdiction with federal courts over ERISA matters[7], we are not technically bound by the newer federal cases relied upon by appellant.
The Employee Retirement Income Security Act (ERISA) was enacted in 1974 for the purpose of protecting workers participating in employee benefit plans from misappropriation and misuse of funds paid into the plan and other abuses by regulating the administration of the plans. 29 USC § 1001(b).[8] ERISA applies to any "employee benefit plan" established or maintained by any employer or employee organization engaged in commerce, or in any industry or activity affecting commerce. 29 USC § 1003(a). While ERISA regulates two types of benefit programs, pension plans and welfare plans, our concern is with the welfare plan. An "employee welfare benefit plan" is defined as
(1) the terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) or this title (other than pensions on retirement or death, and insurance to provide such pensions).
29 U.S.C. 1002(1)
There have been many cases which have attempted to set forth guidelines to determine whether a particular insurance arrangement constitutes an "employee welfare benefit plan." In 1980, the federal Fifth Circuit held that "bare purchases of health insurance where ... the purchasing employer neither directly nor indirectly owns, controls, administers or assumes responsibility for the policy or its benefits" are not governed by ERISA. Taggart Corp. v. Life & Health Benefits Admin., supra. In deciding Taggart the Court was careful to consider ERISA's purpose and legislative history. The Court determined ERISA's purpose would not be served in the Taggart case because the plan at issue did not have any assets which ERISA's safeguards were intended to protect.
*502 However, since 1980, the federal Fifth Circuit has severely limited the Taggart holding by factually distinguishing Taggart on the fact it involved a corporation with only one employee who was essentially purchasing insurance for himself and his family, as opposed to purchasing insurance for a group of employees, through a multiple employer trust. We find this factual distinction as the reason for the more recent federal Fifth Circuit cases not to follow Taggart inappropriate. The factual distinction disregards the purpose and legislative history of ERISA which was so carefully considered by the Court in Taggart.
The later federal cases, while refusing to overrule the "bare purchase" analysis of Taggart, hold that the purchase of a group policy along with the payment of premiums offers "substantial evidence" that a plan has been established. But, the Court admits the mere payment of premiums is insufficient to create an ERISA plan. See Kidder v. H & B Marine, Inc., 932 F.2d 347 (5th Cir.1991), and Memorial Hosp. System v. Northbrook Life Ins. Co., 904 F.2d 236 (5th Cir.1990). In focusing on the employer-employee-plan relationship, the Fifth Circuit Court has apparently abandoned its focus on whether the "plan" is a trust that has assets which are to be protected by the ERISA safeguards.
Because we believe the later federal Fifth Circuit cases are not in accord with Congressional intent, we decline to follow them and instead adhere to the "bare purchase" rationale of Taggart without making what appears to be inconsequential factual distinctions. In Taggart, the employer purchased a group insurance policy through a multiple employers trust (MET). The employer paid its premiums to the MET which in turn forwarded the premiums to an insurer. The employer did not participate in the day-to-day operations or administration of the MET.
In this case, Coast purchased a group insurance policy from a commercial insurance company, Blue Cross. Coast paid premiums directly to Blue Cross. Blue Cross controlled and administered the policy and its benefits. The group insurance policy was nothing more than a bare purchase of health insurance. There is no evidence Coast owned, controlled or assumed responsibility for the policy. Thus, we find Coast's MEP does not constitute an ERISA plan and, therefore, ERISA does not apply.[9]

ISSUE TWO: Was Richard Kornman covered as a dependent under the terms of the Blue Cross policy during his treatment at the Coliseum?
Coast changed its health insurance coverage from the Chamber plan to Blue Cross in July 1984. Under the Chamber plan, Richard was listed as a dependent of Charlie Kornman. When Coast first obtained group health insurance from Blue Cross, Charlie inadvertently failed to list Richard as a dependent. As a result, Carol Rodgers, the Coast employee in charge of the administrative aspects of the company's health insurance plan, sent a letter dated January 21, 1985 to Blue Cross requesting Richard be added as Charlie's dependent. Ten days later, the request was denied by Blue Cross.
We are presented with the question of whether Richard qualified as a dependent under the terms of the policies. The first Blue Cross policy, dated 1984, defined a dependent as:
"Dependent" means a Member for whom current fees have been paid, and who is the Employee's spouse or a Member who depends on the Employee or his spouse for his support as either his:
1. Unmarried child under 19 years of age;
2. Unmarried child 19 to 25 years of age who is enrolled as a full time student:
3. Unmarried child who becomes mentally or physically disabled prior to attaining the limiting age stated in Article I, 1 and/or I, 2 above and/or who is incapable of self-support.
A Member who depends upon the Employee or his spouse for his support must *503 meet the criteria of I, 1 through 3 above, but, to the extent that the above criteria do not conflict, a Member must also qualify as the Employee's or Employee's spouse's Dependent for purposes of the most current calendar year's federal income tax laws and regulations.
(Plaintiff's Exhibit 3).
The July 1985 Blue Cross policy defined a dependent as:
"Dependent" means a Member for whom current fees have been paid and is:
the Employee's legal spouse; and
any unmarried child who:
 is under 19 years old;
 is 19 years old but less than 25 years old, if enrolled in school as a full-time student in a secondary school, college, university, vocational, technical, trade school or institute and primarily supported by the Employee.
 is mentally or physically disabled prior to attaining either of the limiting ages shown above and who is incapable of self-support.
 qualifies as the Employee's or Employee's spouse's dependent for purposes of the most current calendar year's federal income tax laws and regulations.
(Blue Cross' Exhibit 20).
And, the July 1987 Blue Cross policy definition of a dependent is identical to the 1984 definition.
Was Richard capable of self-support?
We do not see any substantial difference in the definition of a dependent between the policies. In July 1984, when Coast's employees' health insurance was first covered by Blue Cross, Richard was 24 years old and not a full-time student. Therefore, the question is whether he was mentally or physically disabled and/or incapable of self-support. Plaintiffs assert "incapable of self support" refers to one's inability for self-sustaining employment. On the other hand, defendant maintains as long as a person has money on which to live, he is capable of self-support. There is no definition for "incapable of self-support" in the contract.
Plaintiffs maintain Richard had a drug problem since high school which rendered him incapable of self-support over the years prior to his hospitalization in that he could not hold a regular job, stay in school, or manage his money. Specifically, his mother, Janette Kornman, testified Richard was expelled from Country Day in high school for drug abuse in 1977. His drug abuse continued over the years and his parents sought help for him several times. Ms. Kornman explained Richard's sporadic job history. She stated she and her husband paid Richard's living expenses, including rent and food, and had to bail him out of his bills several times. Richard himself testified his meals and rent were provided by his parents and he would use any money he had to buy drugs. In summary, Mrs. Kornman testified Richard was never in any condition to support himself. Dr. Weisler, Richard's treating psychiatrist at the Coliseum, testified Richard's drug abuse affected his ability to manage his life. Dr. Weisler was of the opinion Richard was not capable of self-sustaining employment.
Defendant focuses on the fact Richard had a steady income over the years before his hospitalization and that income proves he is capable of self-support. However, the record shows the income was largely owed to his parents. Richard had bank accounts in his name which were set up by his father, Charlie. Richard did not have access to the accounts as they were controlled by his mother and father. Mrs. Kornman explained the accounts were set up for each of the four kids to pay for college tuition and give the kids a head start on life when they finished school but the accounts were maintained and controlled strictly by her husband. The deposits into the accounts included dividend payments from companies set up by Charlie of which the kids were given a percentage. Furthermore, Richard testified when he made money, he spent it on drugs. Richard also stated the last few paychecks he received prior to entering the Coliseum were kept by his father.
The dictionary definition of self-support is "independent support of oneself." Webster's Collegiate Dictionary, Tenth Edition. Independent *504 means not relying on something or someone else. The record shows Richard was financially supported by his parents. The record also shows his drug abuse impaired his ability to manage his life including his health and money. The mere fact Richard had accounts in his name with substantial amounts of money is not axiomatic for his ability to support himself. There is ample testimony showing Richard did not have access to the money. Without the money, he necessarily relied on his parents for food and payment of rent and other bills. Even if Richard had access to the money, we cannot say he was capable of self-support. He admitted the money he did have went to buying more drugs. Defendant points out Richard successfully attended a six-month kibbutz program in Israel where he remained drug free. However, we do not find a six-month period in 1980 to be indicative of whether Richard is capable of self-support in 1984, when the Blue Cross policy went into effect. Richard suffered from a drug addiction that severely impaired his ability to manage his life.
Defendant argues Richard still cannot be a dependent because he did not qualify nor was he claimed as a dependent on his parents' federal tax return as required by the policy. The language of the policy states "to the extent that the above criteria do not conflict, a Member must also qualify as the Employee's... Dependent for purposes of the ... federal income tax laws and regulations." Insofar as Richard could not qualify as a dependent for federal tax purposes, we find such federal provision conflicts with the policy and, therefore, according to the very terms of the policy, the provision is inapplicable.
Was Charlie Kornman required to provide proof of Richard's incapacity and dependency when Richard reached 25, the limiting age?
Defendant next maintains Charlie was required to provide proof of Richard's disability when Richard turned 25-years-old in December 1985 pursuant to La.R.S. 22:215.2(A). La.R.S. 22:215.2(A) provides:
A. Any hospital or medical expense insurance policy delivered or issued for delivery in this state more than ninety days after July 12, 1973, which provides that coverage of a dependent child of an employee or other member of the covered group shall terminate upon attainment of the limiting age for dependent children specified in the policy shall also provide in substance that attainment of such limiting age shall not operate to terminate the coverage of such child while the child is and continues to be both (1) incapable of self sustaining employment, and (2) chiefly dependent upon the policyholder, employee or member for support and maintenance, provided proof of such incapacity and dependency is furnished to the insurer by the employee or member within thirty-one days of the child's attainment of the limiting age and subsequently as may be required by the insurer but not more frequently than annually after the two-year period following the child's attainment of the limiting age.
We find the proof aspect of the statute was not the objective of the legislature in enacting the law but rather the primary intent was to require insurance companies to cover dependent children who have reached the limiting age for said children within the terms of the policy but who remain incapable of self-sustaining employment and are dependent for their support. The statute allows the insurance company to require proof of such incapacity and dependency as an ancillary. While Blue Cross included the requisite coverage, it did not mandate the proof element. We find Blue Cross effectively excluded the proof element of the statute and such exclusion does not thwart the intent of the law. Thus, Charlie was not required to provide proof of Richard's dependency where such proof was not requested by Blue Cross.
Could Blue Cross have denied Richard coverage based on information in a health questionnaire?
Defendant raises yet another issue regarding Richard's qualification as a dependent. Defendant asserts material misrepresentations were made by Charlie concerning Richard's prior health problems when he submitted the "Change of Status Form" attempting to add Richard as a dependent. *505 Specifically, Byron Gorman, an insurance claims adjuster for Blue Cross, testified that had Richard's health questionnaire indicated he had a previous drug problem, he would have been rejected outright.
However, La.R.S. 22:215(A)(1)(a) precludes an insurer from issuing a group health insurance plan that allows for individual selection. Since Blue Cross could not legally exclude Richard from coverage, we find it unnecessary to determine whether material misrepresentations were made.
Having found Richard qualified as a dependent, we turn our analysis to whether his treatment at the Coliseum was covered.[10]

ISSUE THREE: Was Richard's treatment at the Coliseum covered by the terms of the policy?
Did Richard's treatment at the Coliseum fall during the 365-day exclusion period for pre-existing conditions?
Defendant alternatively asserts if Richard was a qualified dependent, there was a 365-day waiting period for subsequent enrollees for pre-existing conditions. All three policies, 1984, 1985 and 1987, provided a 365-day waiting period for pre-existing conditions for subsequent enrollment which began to run from the original effective date. Mildred Echlin, an employee of Blue Cross, testified she reviewed Richard's claim and denied it because his treatment was for a preexisting condition for which the time delays for coverage had not run.
Plaintiffs concede Richard was left off of Charlie's original enrollment application. Therefore, according to Ms. Echlin's testimony, Richard could not have been considered an initial enrollee and was thus subject to the delays for pre-existing conditions. We accept Richard was a subsequent enrollee subject to the 365-day waiting period for pre-existing conditions.
However, we have determined Richard qualified as a dependent under the July 1984 policy as well as the subsequent 1985 and 1987 policies. Therefore, Richard was a qualified dependent when Charlie sought to add him to his policy in January 1985 and should have been added as such. Thus, even accepting defendant's argument there was a 365-day waiting period for coverage of Richard's pre-existing condition of substance abuse, that period expired in January 1986 at which time Richard was afforded full coverage. Richard was hospitalized in May 1987 through April 1988. It is clear Richard was afforded coverage for his treatment during the time he was hospitalized.
Was Richard treated for substance abuse or for a mental condition for which there is a policy limit of $5,000?
Defendant claims the maximum amount of benefits plaintiffs can recover is $5,000 because Richard's treatment was for a mental disorder for which there is a $5,000 policy limit. Since Richard was hospitalized in May 1987, the governing policy is the July 1985. The policy provided:
After the applicable Comprehensive Medical Expense Deductible as shown in the Schedule of Benefits has been met, We agree to pay for the treatment of mental and nervous disorders, the coinsurance percentage shown in the Schedule of Benefits for mental and nervous incurred by each Member, not to exceed the applicable Limit of Liability shown for mental and nervous in the Schedule of Benefits.
Byron Gorman, a former employee of Blue Cross, testified the policy limits for a mental disorder was $5,000.
Dr. Weisler, Richard's treating psychiatrist at the Coliseum, testified drug abuse was the primary cause of Richard's problems which included at times psychotic like symptoms. Dr. Weisler further stated there were many symptoms that resulted from Richard's drug abuse including problems relating to people and managing his life. During cross-examination, Dr. Weisler was presented with some results of psychological tests concerning Richard's condition. The tests indicated Richard suffered from some sort of psychotic illness which is a mental disorder. However, Dr. Weisler explained these tests are not a diagnosis but rather explain the condition of the patient. Although asked numerous times *506 on cross-examination, Dr. Weisler emphatically denied Richard's condition as being one of a mental disorder. When Richard was admitted to the Coliseum, his records indicate his diagnosis was borderline personality disorder which Dr. Weisler admits is a mental disorder. However, we are convinced and accept the explanation of Dr. Weisler that Richard's primary problem was substance abuse which led to secondary problems. And while Richard may have been treated for secondary problems, we believe his primary treatment was for substance abuse which is the reason he was judicially committed.
Was Richard's treatment at the Coliseum medically necessary?
The 1985 policy defines "medically necessary" as Health Care services which:
are appropriate and consistent with the diagnosis and which, in accordance with accepted medical standards in the State of Louisiana, could not have been omitted without adversely and severely affecting the patient's condition;
are not primarily Custodial Care;
are appropriate and can be safely used under the circumstances. Inpatient Hospital Services should be used only when a lesser equipped facility (e.g. Outpatient Hospital Services, Physician's office, etc.) could adversely and severely affect the patient's condition.
The 1987 policy provided basically the same definition:
"Medically Necessary" means a service or treatment which, in the judgment of the Plan:
1. Is appropriate and consistent with the diagnosis and which in accordance with accepted medical standards in the State of Louisiana could not have been omitted without adversely affecting the patient's condition or the quality of medical care rendered; and
2. Is not primarily Custodial Care; and
3. As to institutional care, could not have been provided in a Physician's office, in the Outpatient department of a Hospital, or in a lesser facility without adversely affecting the patient's condition or quality of medical care rendered.
In arguing Richard's treatment at the Coliseum was not medically necessary, defendant relies on the testimony of its expert, Dr. Olivier. However, we note Dr. Olivier's testimony was rejected by the trial court and is in the record through a proffer. However, defendant did not raise as an issue on appeal that the exclusion of Dr. Olivier's testimony was erroneous. Therefore, we cannot consider the proffered testimony.
Considering the record, we find Richard's treatment was medically necessary. It is absurd to argue Richard's condition would not have been adversely and severely affected if he had not received treatment at the Coliseum. Furthermore, after unsuccessfully being treated on an outpatient basis by various psychiatrists and doctors, we do not find Richard's condition could have been treated at a lesser facility.

CONCLUSION
We find Coast's MEP was not an ERISA plan. Later federal jurisprudence which severely restricts the holding of Taggart, which was relied on by the Eastern District and the trial court in determining Coast's MEP was not an ERISA plan, is not binding on us as a state court but rather is merely persuasive. For the reasons above, we decline to follow the more recent federal jurisprudence due to our opinion it disregards the Congressional intent behind ERISA's enactment. We adhere to the rationale and the "bare purchase" test of Taggart and find Coast's MEP was nothing more than a bare purchase of health insurance for its employees.
After reviewing the terms of the Blue Cross policies, we find Richard Kornman was covered as a dependent of Charlie Kornman because he was incapable of self-support. Thus, Richard should have been added to Charlie's policy in January 1985 when he so requested it. We find proof of Richard's dependency was not required absent a request by Blue Cross. And, because we find Blue Cross could not have legally denied Richard coverage on the basis of his health, the issue of whether material misrepresentations were made on his health questionnaire is of no consequence.
*507 Being added after the initial enrollment date of July 1984, Richard was a subsequent enrollee who was subject to the 365-day time delay for coverage of pre-existing conditions. However, the time delay had expired when Richard was hospitalized in May 1987. Thus, he was covered for treatment of substance abuse during the time he was hospitalized.
We find Richard's treatment was for substance abuse and not a mental disorder and, therefore, the policy limit of $5,000 for treatment of mental disorders is inapplicable. And, we find Richard's treatment at the Coliseum was medically necessary as there was no evidence to the contrary.
For the above reasons, we hereby affirm in toto the trial court's judgment dated September 30, 1993 awarding judgment in favor of plaintiffs-appellees.
Appellant is to bear the costs for this appeal.
AFFIRMED.
NOTES
[1] Since filing this suit, Charlie Kornman passed away and his estate was substituted as a plaintiff. Additionally, Richard Kornman, was added as a plaintiff after the suit was initially filed.
[2] Defendant, Louisiana Health Service & Indemnity Company, was erroneously named by plaintiffs as Blue Cross/Blue Shield of Louisiana. However, for purposes of this appeal, we will refer to defendant-appellant as Blue Cross.
[3] We note the order of remand is not included in the appellate record. However, appellees attached a copy of the Eastern District Court's order and reasons dated October 21, 1988 to their brief which shows the Court found the plan in question was not an ERISA plan.
[4] If ERISA applies, plaintiffs would be prevented by federal preemption from recovering penalties allowed under state law for an insurer's arbitrary and capricious failure to pay a claim. See Cramer v. Association Life Ins. Co., 569 So.2d 533 (La.1990); cert. denied, 499 U.S. 938, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991).
[5] These cases include Hansen v. Continental Ins. Co., 940 F.2d 971 (5th Cir.1991); Kidder v. H & B Marine Inc., 932 F.2d 347 (5th Cir.1991); and Memorial Hospital System v. Northbrook Life Ins. Co., 904 F.2d 236 (5th Cir.1990).
[6] We note the only cause of action affected by the application of ERISA is for the recovery of penalties because attorney's fees may be recovered under ERISA. See 29 USC § 1132(g)(1) which provides, "... the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."
[7] See 29 USC § 1132(e)(1).
[8] See also, Comments, Small Employers and Group Health Insurance: Should ERISA Apply?, 52 La.L.Rev. 971 (1992).
[9] Because we find ERISA does not apply, we need not address appellant's ERISA related issues of whether the Coast MEP is an indispensable party, whether plaintiffs' suit is premature for failure to exhaust administrative remedies provided for in the MEP and whether plaintiffs' state law claims for penalties is preempted by ERISA.
[10] Because we determined Richard was a dependent under the policy, we find no need to address whether he was independently covered as an employee of Coast.