683 So.2d 1204 (1996)
SHELL OIL COMPANY, et al.
v.
SECRETARY, REVENUE AND TAXATION.
No. 96-C-0929.
Supreme Court of Louisiana.
November 25, 1996.
*1205 Mark Brent Meyers, Mark S. Stein, Charles DeWitt Hunley, Randall G. Durfee, Lowe, Stein, Hoffman, Allweiss & Hauver, New Orleans, for Applicant.
Robert G. Pugh, Pugh, Pugh & Pugh, Shreveport, for Respondent.
J. Edgerton Pierson, Jr., Shreveport, for NorAm Energy Corporation, Mississippi River Transportation Corp., Murphy Oil USA, Inc., Total Minatome Corporation, and Pennzoil Exploration and Production Corporation (Amicus Curiae).
Malcolm Stanton Murchison, Shreveport, for Pennzoil Exploration and Production Corporation (Amicus Curiae).
MARCUS, Justice.[*]
Pursuant to La.R.S. 47:1541-1565, the Department of Revenue and Taxation, State of Louisiana, conducted an audit and thereafter assessed Shell Oil Company and Shell Western E & P Inc. (hereinafter collectively referred to as "Shell") for severance taxes on oil and gas produced under mineral leases granted by the United States Department of Interior covering certain lands within the confines of Barksdale Air Force Base. The *1206 taxes were assessed for the taxable period from January 1, 1980 through February 28, 1986. Shell filed petitions with the Louisiana Board of Tax Appeals disputing the taxes and interest assessed.[1] Initially, Shell took the position that the imposition of state severance taxes on minerals produced pursuant to the Barksdale leases for any taxable period violates Art. I, § 8, cl. 17 of the United States Constitution, which grants exclusive legislative jurisdiction over federal enclave lands to the United States Congress when the state has consented thereto.
The Board of Tax Appeals rendered judgment in favor of Shell, whereupon the state timely filed a petition for review to the Civil District Court for the Parish of Orleans. The trial judge reversed the Board of Tax Appeals and held that the state could assess and collect the severance taxes at issue from January 1, 1980 forward. Judgment was rendered in favor of the state for the severance taxes owed plus interest and attorney fees. On appeal, the Court of Appeal, Fourth Circuit, affirmed the judgment of the trial judge, holding: (1) that 1973 amendments to state law regarding the method of calculation of severance taxes brought the taxes imposed within the meaning of an "income tax," as that term is used in the Buck Act, 4 U.S.C. § 106, which permits a state to levy an income tax within a federal enclave; and (2) that 1976 amendments to the Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351-359, also support imposition of the severance tax.[2]
In its writ application to this court, Shell abandons the argument that federal law prohibits imposition of the taxes at issue. Rather, it argues that collection of severance taxes was not authorized under state law until September 10, 1982, the effective date of an amendment to La.R.S. 52:1. We granted certiorari to determine whether the decision of the court of appeal permitting imposition of the severance tax was correct as to the limited period of time from January 1, 1980 through September 10, 1982, the effective date of the amendment to La.R.S. 52:1.[3]
The narrow issue presented for our review is whether the State of Louisiana, through the Secretary of the Department of Revenue and Taxation, can lawfully impose severance taxes on fugitive oil and gas captured by Shell from beneath a portion of the lands within the confines of Barksdale Air Force Base, a federal enclave, for the taxable period of January 1, 1980 through September 10, 1982. In order to fully address the issue before us, it is necessary to review the history of Barksdale Air Force Base and pertinent state and federal legislation and jurisprudence.
In 1930, the State of Louisiana, the City of Shreveport, and the Bossier Levee District donated approximately 22,000 acres of land and the beds of the waters within the area to the United States to be used as an Army Air Force Base. At that time the Louisiana Constitution provided for the imposition of a severance tax on fugitive oil and gas and the legislature had already enacted revenue laws governing the assessment of severance taxes.[4] Louisiana's law with respect to the nature of fugitive oil and gas was also clearly established. Oil and gas beneath the surface of the earth was and still is regarded as insusceptible of private ownership and is not part of the land through and under which it flows. Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207 (1920).
In 1943, the Department of the Army transferred the right to grant mineral leases for exploration and production of fugitive oil and gas beneath certain areas of the Barksdale Base to the Department of Interior, and the Department subsequently granted mineral leases to various private companies, beginning *1207 in 1951.[5] Soon after production commenced pursuant to the first leases granted, the state assessed severance taxes against the Barksdale mineral lessees. The lessees paid the taxes under protest and filed a petition for refund, arguing that Louisiana was divested of its taxing powers relative to Barksdale by virtue of Article I, § 8, cl. 17, of the Constitution of the United States and La.R.S. 52:1. Murphy Corp. v. Fontenot, 225 La. 379, 73 So.2d 180, cert. denied, 348 U.S. 831, 75 S.Ct. 54, 99 L.Ed. 655; reh'g denied, 348 U.S. 890, 75 S.Ct. 204, 99 L.Ed. 699 (1954).
In Murphy, we held that neither the federal constitution nor La.R.S. 52:1 prohibit the imposition of severance taxes on the actions of mineral lessees in capturing and severing fugitive oil and gas beneath the Barksdale Base. Prior to its amendment in 1982, La. R.S. 52:1 provided in pertinent part:
The United States ... may acquire and occupy any land in Louisiana for the purposes of the federal government. The United States shall have exclusive jurisdiction over the property during the time that the United States is the owner or lessee of the property. The property shall be exempt from all taxation, assessments, or charges levied under authority of the state (emphasis added).
We held that the tax exemption provision in La.R.S. 52:1 did not preclude assessment of severance taxes on Barksdale mineral lessees, despite its seemingly broad prohibition of taxation of federal lands. We noted:
The fugitive oil and gas when captured did not belong to the Federal Government but to private owners. No severance tax is levied against the Government nor is there any tax levied on the lands or the instrumentalities of the Federal Government. Murphy, 73 So.2d at 184.
Thus, we interpreted La.R.S. 52:1, prior to its amendment in 1982, as creating no impediment to the imposition of severance taxes on Barksdale mineral lessees.
Art. I, § 8, cl. 17 of the federal Constitution provides that Congress shall have the power to:
exercise exclusive Legislation in all Cases whatsoever ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings (emphasis added).[6]
We held in Murphy that our cession of exclusive jurisdiction over lands acquired by the United States did not carry with it such exclusive jurisdiction over underlying fugitive oil and gas that the state is without authority to impose severance taxes on mineral lessees who sever Louisiana's natural resources flowing beneath the Barksdale Base.[7]
Perhaps hoping to find a more sympathetic ear in a federal forum, other Barksdale mineral lessees raised the same state statutory and federal constitutional issues in federal court in Mississippi River Fuel Corporation v. Fontenot, 234 F.2d 898 (5th Cir.1956), cert. denied, 352 U.S. 916, 77 S.Ct. 213, 1 L.Ed.2d 122, arguing that since Louisiana had ceded exclusive jurisdiction over the base to the federal government, it had no remaining jurisdiction to impose any taxes whatsoever with respect to the base. The United States Court of Appeals for the Fifth Circuit rejected that argument and agreed with the result we reached in Murphy. It held that the mineral lessees' arguments were "based upon the wholly incorrect assumption that the severance taxes in question represent an attempt on the part of the State of Louisiana to exercise legislative and *1208 executive jurisdiction over the lands in question...." 234 F.2d at 901 (emphasis added). Instead, the Fifth Circuit found that the distinctive nature of the severance tax and Louisiana's laws with respect to fugitive oil and gas demonstrated the fallacy of that argument. The court explained:
the object and purpose of the general severance tax and its effect is not to levy a tax upon the lands included in the base or upon the oil or gas while a part of the base. The tax is expressly made to apply not while the oil or gas is in the earth but when it is severed from its surface, and then it obliges the person severing to file a statement of his business and to pay his tax. In Louisiana, as is well known, there is no ownership of oil and gas in place, and neither in theory nor in fact is the tax here in question imposed upon it while it is a part of the soil or ground. 234 F.2d at 901-902.
Accordingly, the Fifth Circuit concluded, as did this court in Murphy, that the imposition of the severance tax did not fall within the immunity from taxation granted by La.R.S. 52:1 and that the tax did not constitute an infringement on the exclusive federal jurisdiction over the base.
In 1964, the United States Supreme Court rendered a decision which, although addressing the imposition of an altogether different type of tax, would later be interpreted by the Fifth Circuit as casting doubt on the continued validity of our holding in Murphy and its own decision in Mississippi River Fuel Corporation v. Fontenot. In Humble Pipe Line Co. v. Waggonner, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964), the Court faced the issue of "whether the United States has such exclusive jurisdiction over a 22,000 acre tract of land in Louisiana on which the Barksdale Air Force base is located that Louisiana is without jurisdiction to levy an ad valorem tax on privately owned property situated on the tract." 376 U.S. at 370, 84 S.Ct. at 858, (emphasis added). In Humble, the Court held that the government had exclusive jurisdiction over the Barksdale land it acquired by donation under Art. I, § 8, cl. 17 of the federal Constitution, and that its jurisdiction over certain areas of the base was not divested by leasing and fencing off certain sections of the property. The Court concluded that the state, having ceded jurisdiction over the land to the government, no longer had jurisdiction to impose ad valorem taxes on property of third parties situated on the land within the confines of the base, unless Congress specifically ceded back to the state jurisdiction to levy taxes within the federal enclave. The Buck Act, 4 U.S.C. §§ 104-110, was cited as an example of the manner in which Congress can retrocede taxing authority within a federal enclave over which it has acquired exclusive jurisdiction. Id. at 374, 84 S.Ct. at 860-61.
Although the Louisiana appellate court case which gave rise to the grant of certiorari by the Supreme Court in Humble relied heavily on our decision in Murphy and the Fifth Circuit case following Murphy,[8] the United States Supreme Court in Humble made no reference whatsoever to those decisions. The issue of whether the imposition of severance taxes was permissible under La. R.S. 52:1 and Art I, § 8, cl. 17 of the federal Constitution was not before the Court.
Nevertheless, the Barksdale lessees seized upon the language in Humble as undermining our holding in Murphy with respect to severance taxes and again challenged the severance tax in federal court. Mississippi River Fuel Corporation v. Cocreham, 247 F.Supp. 819 (E.D.La.1965). The district court judge, the Honorable Judge E. Gordon West, pointed out that the grant of exclusive jurisdiction in La.R.S. 52:1 was over property acquired by the government and the statute provided that lands held would be exempt from taxation. Citing established Louisiana law, Judge West demonstrated that fugitive oil and gas were neither part of the property donated to the federal government nor part of the land acquired or exempted from taxation. The court held:
It is only the land and other property owned by the United States that is exempt from taxation by the state. It is well settled that the Louisiana severance tax is not a property tax. It is an excise tax *1209 imposed upon the privilege of severing. It is not even a tax upon the ownership of oil and gas, but is an excise tax upon the right to sever or produce the oil and gas. Gulf Refining Co. of Louisiana v. McFarland, 154 La. 251, 97 So. 433 (1923).... The imposition of such a tax in no way interferes with the exclusive jurisdiction of the United States over the land acquired by it from the State of Louisiana. 247 F.Supp. at 824 (emphasis added).
The district court judge specifically opined that the Humble case, dealing with ad valorem taxes, did not overrule the earlier Fifth Circuit case which held, as we did in Murphy, that imposition of a severance tax on Barksdale mineral lessees is permissible under both state and federal law.
On appeal, a divided panel of the Fifth Circuit reached the opposite conclusion. The Fifth Circuit held, based on Humble, that once exclusive jurisdiction was transferred, the state automatically lost all taxing authority, unless and until the federal government ceded that authority back to the state. Mississippi River Fuel Corporation v. Cocreham, 382 F.2d 929 (5th Cir.1967), on reh'g, 390 F.2d 34 (5th Cir.1968), cert. denied, 390 U.S. 1014, 88 S.Ct. 1264, 20 L.Ed.2d 164 and 390 U.S. 1015, 88 S.Ct. 1264, 20 L.Ed.2d 164. It further held that the government had not in fact retroceded authority to the state to impose a severance tax under the Buck Act, 4 U.S.C. §§ 104-110, which authorizes the imposition of an "income tax" within a federal enclave. The court held that Louisiana's severance tax, which at that time was computed on the quantity of natural resources severed, did not fall within the definition of an "income tax" under the Buck Act. 4 U.S.C. § 110(c).[9]
Judge Rives, dissenting on rehearing, reiterated that for the grant of exclusive jurisdiction pursuant to Art. I, § 8, cl. 17 of the federal Constitution to take effect, the consent of the Louisiana legislature was required.[10] He noted that Humble did not address the critical question of whether the state's consent to exclusive jurisdiction over the land carried with it consent to exclusive jurisdiction over the fugitive oil and gas flowing beneath the land, which, under state law, was not part of the land. Judge Rives concluded, based on the Acts of Donation and Louisiana concepts of the fugitive nature of oil and gas, that the state had not ceded exclusive jurisdiction over the oil and gas beneath the surface, which did not form part of the land donated. Distinguishing Humble, the judge noted:
Notwithstanding some broad expressions in the Supreme Court's opinion, it actually decided no more than the question presented. I submit that its decision does not conflict with our decision in Mississippi River Fuel Corporation v. Fontenot, supra, for the reason that Louisiana has never ceded nor relinquished its right to levy a tax or charge on the extraction of oil and gas which constitute a part of the State's natural resources. 390 F.2d at 39 (emphasis in original).
In our view, the reasons for judgment expressed by the district court and in the dissenting opinion of Judge Rives accurately reflect the scope of exclusive jurisdiction granted by our legislature and echo our authoritative holding in Murphy that La.R.S. 52:1 was never intended as an expression of legislative consent to such exclusive jurisdiction as would exempt mineral lessees from a tax on the privilege of severing Louisiana's natural resources flowing beneath the Barksdale Base.
While we may regard decisions of the federal Fifth Circuit as persuasive in *1210 certain cases, particularly cases addressing purely federal questions, we are not bound by its decision in Cocreham,[11] especially since the question of what our legislature ceded to the United States and the interpretation of La.R.S. 52:1 are, at least in the first instance, questions of state law upon which we have already ruled. Federal appellate decisions will not be followed in the face of positive jurisprudence of the Supreme Court of Louisiana to the contrary. Hinchee v. Long Bell Petroleum Co., 235 La. 185, 103 So.2d 84 (1958). Nor do we believe that the United States Supreme Court intended its decision in Humble to have the reach ascribed to it by the Cocreham court. In Humble, the Court dealt with an ad valorem tax on property located on land subject to the exclusive jurisdiction of the United States. It did not deal with a tax on the privilege of severing natural resources that form no part of the land donated. The Supreme Court has recognized that it is bound by our interpretation of Louisiana's statutes. Garner v. State of Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961). Moreover, even though the extent of the jurisdiction of the United States under Art. I, § 8, cl. 17 of the Constitution is a federal question, when the question to be resolved depends upon the construction of state law, the Supreme Court has acknowledged:
we should, in harmony with our principles of decision in such cases, give great weight to the views of the state court as to the intent and limitations of the state statute in granting consent and cession. We should accept that construction unless we are satisfied that it does violence to federal right based upon the statute, defeating the reasonable anticipation and purpose of securing through the operation of the statute an essential and exclusive legislative authority for the Federal Government. Silas Mason Co. v. Tax Commission, 302 U.S. 186, 206-207, 58 S.Ct. 233, 243, 82 L.Ed. 187 (1937) (citations omitted).
We cannot assume that the Supreme Court, had it been faced with a severance tax issue, would have disregarded our interpretation of Louisiana laws and the relevant acts of donation.
Faced with a Fifth Circuit decision holding that the state's severance tax could not be imposed on Barksdale lessees, and the Fifth Circuit's willingness to interfere with the imposition of state taxes, the state suspended its efforts to collect severance taxes from the Barksdale lessees during the 1970's. However in 1981, the United States Supreme Court issued an opinion regarding the imposition of severance taxes by the State of Montana on third party mineral lessees of federal forest lands, which some viewed as calling into question the Fifth Circuit's expansive interpretation in Cocreham of the earlier Humble opinion. In Commonwealth Edison Company v. Montana, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981), the Court expressly held that imposition of a severance tax on mineral lessees mining coal from beneath federal forests in Montana did not violate the Supremacy Clause. While the lands in question in Commonwealth Edison were not federal enclave lands subject to the specific jurisdictional parameters set forth in Art I, § 8, cl. 17 of the federal Constitution, the decision at least seemed to evidence a reluctance to preclude the imposition of severance taxes on federal lands under preemption and Supremacy Clause arguments.[12]
In addition, amendments to state and federal laws in the 1970's, after the Humble and Cocreham decisions, were regarded by the *1211 state as impacting its ability to enforce Louisiana's severance tax laws against the Barksdale lessees. In 1973, La.R.S. 47:633 was amended to change the manner of calculating the severance tax on oil from a computation based on the quantity of oil captured to one based on a percentage of the value of the oil as measured by the gross receipts received from the first purchaser or the posted field price. The state takes the position that the change brought the Louisiana severance tax on oil within the definition of an "income tax" as defined in the Buck Act, which specifically retroceded to the states the authority to impose income taxes within a federal enclave such as Barksdale.
Furthermore, in 1976 Congress amended the Mineral Leasing Act for Acquired Lands. That Act permits the imposition of severance taxes on mineral lessees of federal lands, including federal enclaves.[13] Prior to 1976, military bases were excluded from coverage by the Act. 30 U.S.C. § 352. The 1976 amendments removed that exclusion, thereby bringing military bases within the coverage of the Act. Thus the state argues that even if it lost its power to impose severance taxes on the Barksdale lessees by its grant of exclusive jurisdiction over the base (as the Fifth Circuit held in Cocreham and contrary to our holding in Murphy), the 1973 and 1976 amendments to state and federal law effected a retrocession of that taxing authority to the state over both oil and gas.
The state resumed its efforts to collect severance taxes from the Barksdale mineral lessees in 1982. In addition, the legislature amended La.R.S. 52:1 in 1982 to add language affirming the State's intent to collect severance taxes from third party lessees of federal lands. The amended statute now provides with respect to land acquired by the federal government and over which exclusive jurisdiction was granted:
B. The property shall be exempt from all taxation, assessment, or charge levied under authority of the state. Nothing herein shall be construed or held to affect the rights of Louisiana or other local authority to exercise any rights which they may have, including the right to levy and collect taxes upon the severance of natural resources, or other rights, property, or assets of any lessee of the United States.
There is no question that the legislature, by amending La.R.S. 52:1, intended to make clear its authorization for the imposition of severance taxes on mineral lessees of federal lands. However, it is equally clear that under state law, as we interpreted it in Murphy, that authorization had always existed. In 1982, the state notified certain Barksdale mineral lessees that it would again require severance tax payments. As had been the practice in the past, the lessees paid under protest and sought a ruling in federal court that the taxes were unconstitutional and should be refunded. However, rather than granting the relief requested, as it had in Cocreham, the Fifth Circuit held that the federal court was without subject matter jurisdiction over the controversy by virtue of the Anti-Injunction Act, 28 U.S.C. § 1341, which provides that the federal district courts "shall not enjoin, suspend or restrain the assessment, levy, or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state." MRT Exploration Company v. McNamara, 731 F.2d 260 (5th Cir.1984). The earlier decision of the Fifth Circuit in Cocreham, which had expansively construed Humble, was thereby called into question, since that decision reached the merits without considering the subject matter bar to exercising jurisdiction over the tax refund question. Therefore, the ruling in Cocreham, the seminal authority for extending Humble to the issue of severance taxes, is of questionable precedential *1212 value, even in the federal system.[14] It is, of course, not binding on this court.
Unsuccessful in obtaining federal relief, the MRT plaintiffs then prosecuted a tax refund action in state court, again arguing that the Humble decision and the Fifth Circuit decision in Cocreham had effectively settled the issue and that the state could not impose a severance tax on Barksdale lessees without running afoul of the United States Constitution. The district court rendered judgment in favor of the state, finding that by virtue of the 1973 amendments to the state's severance tax law (which made the Buck Act applicable) and the 1976 amendments to the Mineral Leasing Act for Acquired Lands, both of which occurred after the Humble and Cocreham decisions, Congress had retroceded to the state the authority to impose a severance tax on the Barksdale lessees. The Court of Appeal, First Circuit, affirmed, assuming, without discussion, that the Humble case controlled the severance tax issue, but that Congress had subsequently retroceded to the state authority to impose a severance tax within the Barksdale enclave.[15]
The instant case is yet another attempt by Barksdale lessees to avoid Louisiana severance taxes by wrapping around themselves the mantle of immunity from taxation granted to the federal government. As in previous cases, Shell initially took the position that Humble controlled and that the imposition of a severance tax on Barksdale mineral lessees for any period of time violates the exclusive jurisdiction of the United States. At this stage of the litigation, however, Shell concedes that severance taxes can be lawfully imposed for the period after the amendment of La.R.S. 52:1. It no longer argues that there is a federal jurisdictional impediment to the imposition of the tax pursuant to Art. I, § 8, cl. 17 of the federal Constitution. Accordingly, Shell implicitly accepts, at least for purposes of this litigation, the holding of the Court of Appeal, Fourth Circuit, in this case that the Buck Act and the 1976 amendments to the Mineral Leasing Act for Acquired Lands effectively ceded back to the state whatever exclusive taxing authority the federal government acquired pursuant to the original acts of donation and the cession of jurisdiction in the pre-amendment version of La.R.S. 52:1.
However, Shell now contends that some affirmative act of the legislature was necessary by which the state would accept the retrocession of taxing authority. Shell argues that, prior to its amendment, La.R.S. 52:1 prohibited taxation of mineral lessees on federal lands and that an affirmative act accepting the retrocession of taxing authority did not take place until the amendment of La.R.S. 52:1 in 1982. Shell therefore contends that no severance tax can be imposed for the period prior to the effective date of the amendment, September 10, 1982. We disagree.
First, we believe that our holding in Murphy controls this case. There we held as a *1213 matter of state law that the grant of exclusive jurisdiction over the Barksdale lands did not preclude the imposition of a severance tax. The legislative cession of exclusive jurisdiction over lands acquired by the United States did not carry with it a cession of exclusive jurisdiction over the fugitive oil and gas flowing beneath the surface, which, under state law, did not form part of the land donated or addressed by the provisions of La.R.S. 52:1. We do not view Humble as overruling sub-silentio our authoritative interpretation of state law issues nor are we bound by the federal Fifth Circuit's expansive view of Humble in Cocreham, which is of dubious precedential value. In our view, the state had authority to impose the severance tax on Shell both before and after the amendment to La.R.S. 52:1.[16]
Moreover, even if we agreed with the Fifth Circuit's reading of Humble in Cocreham, which we do not, we would nevertheless uphold the imposition of the severance tax prior to the effective date of the amendment to La.R.S. 52:1 on September 10, 1982. Even if the state's grant of exclusive jurisdiction had carried with it exclusive jurisdiction over fugitive oil and gas below the surface, we believe that the Buck Act together with the Mineral Leasing Act for Acquired Lands evidence the intention of Congress to cede back to the state authority to impose severance taxes on mineral lessees of federal enclave lands.[17] The 1982 amendment to La.R.S. 52:1 was not required in order to permit the state to take advantage of any taxing authority retroceded to the state. Acceptance of such a retrocession is assumed in the absence of a showing of contrary intent. When the federal government has exclusive jurisdiction over an area within the bounds of the state, the state's authority lies dormant. When that exclusive jurisdiction is retroceded to the state by Congress, the sovereign powers of the state revive automatically to the extent of the retrocession.[18]
We believe that the state consistently evidenced its intention to exercise its severance taxing authority pursuant to the pre-amendment version of La.R.S. 52:1 by its many attempts to assess the tax and the history of litigation we have outlined above. The fact that the state may not have enforced its right to collect severance taxes from the Barksdale lessees after the Fifth Circuit's expansive interpretation of Humble in Cocreham, does not mean that the state did not have the right to collect the taxes. The state's inaction could not change our authoritative interpretation of the statute in Murphy and certainly did not constitute evidence of a refusal to accept Congress's retrocession of taxing authority. In short, we believe that everything necessary to permit the taxation of the Barksdale mineral lessees was already in place before the amendment to La.R.S. 52:1. The pre-amendment version of La.R.S. 52:1 did not, as Shell now argues, prohibit the *1214 imposition of a severance tax. We so held in Murphy. Whether or not the operation of the statute as construed by this court was constitutionally permissible under federal jurisdictional principles prior to the 1973 amendments to our severance tax law which made the Buck Act applicable and prior to the 1976 amendments to the Mineral Leasing Act for Acquired Lands, once those statutes came into play, our interpretation of La.R.S. 52:1 in Murphy was all that was necessary to support the imposition of the tax. Accordingly, we hold that the State of Louisiana, through the Secretary, Department of Revenue and Taxation was empowered to impose a severance tax on the severance of fugitive oil and gas from beneath the Barksdale Air Force Base for the taxable period from January 1, 1980 through September 10, 1982.

DECREE
For the reasons assigned, the judgment of the Court of Appeal, Fourth Circuit, is affirmed.
NOTES
[*] Johnson, J., not on panel. Rule IV, Part 2, § 3.
[1] Shell's petitions were docketed as B.T.A. Nos. 3394 and 3395. Shell contested the imposition of oil severance taxes in the amount of $1,135,901.43 and gas severance taxes in the amount of $557,770.50. The appeals were consolidated for hearing with two unrelated matters, B.T.A. Nos. 3392 and 3393, which are not before us for review.
[2] 95-2113 (La.App. 4th Cir. 3/14/96); 671 So.2d 1026.
[3] 94-0929 (La.6/21/96); 675 So.2d 1093.
[4] La. Const. Art. X, § 21 (1921); La. Acts 1922, No. 140.
[5] Jurisdiction was transferred to the Department of Interior and the lands were leased pursuant to Presidential Executive Orders, 9146 [7 F.R. 3067], 9337 [8 F.R. 5516], 10355 [17 F.R. 4831] and Public Land Orders 701, 884, 1807 and 2178. At that time mineral leases covering the Barksdale Base could not be granted pursuant to the 1947 Mineral Leasing Act for Acquired Lands because the Act excluded military bases from its coverage.
[6] The United States Supreme Court has held that the reference in the Constitution to lands "purchased" also encompasses lands donated to the government. Humble Pipe Line Co. v. Waggonner, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964).
[7] In Murphy, we also interpreted our cession of exclusive jurisdiction as predicated on the continued use of the donated lands for military purposes.
[8] Mississippi River Fuel Corporation v. Fontenot, 234 F.2d 898 (5th Cir.1956).
[9] See also Shell Oil v. Mouton, 410 F.2d 715 (5th Cir.1969) and Mouton v. Sinclair Oil and Gas Company, 410 F.2d 717 (5th Cir.1969), cert. denied, 398 U.S. 957, 90 S.Ct. 2163, 26 L.Ed.2d 542 (1970), wherein the Fifth Circuit issued per curiam opinions based on its decision in Cocreham.
[10] The mere acquisition of title by the United States is not sufficient to debar a state from exercising taxing and police power in relationship to acquired property. To completely exclude the authority of the state under Art. I, § 8, cl. 17 of the federal Constitution, it must appear that the state, by consent or cession, has transferred to the United States that residuum of jurisdiction it would otherwise be free to exercise. See, e.g., Silas Mason Co. v. Tax Commission, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187 (1937), and cases cited therein.
[11] In matters involving federal law, state courts are bound only by decisions of the United States Supreme Court. Federal appellate court decisions are persuasive only. State v. Sanders, 93-0001 (La.11/30/94); 648 So.2d 1272, cert. denied, ___ U.S. ___, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); Kornman v. Blue Cross/Blue Shield of La., 94-306 (La.App. 5th Cir. 9/26/95); 662 So.2d 498, writ denied, 95-3025 (La.2/16/96); 667 So.2d 1054, cert. denied, ___ U.S. ___, 116 S.Ct. 2527, 135 L.Ed.2d 1051 (1996).
[12] We do not comment on the extent to which the decision in Commonwealth Edison may properly be considered as persuasive authority in this case. However, it is apparent from the legislative history of La.R.S. 52:1, that members of the Department of Revenue viewed the Commonwealth Edison decision as justifying renewed efforts to collect severance taxes from the Barksdale lessees. Accordingly, the decision is part of the historical development relevant to this matter.
[13] The Mineral Leasing Act for Acquired Lands was enacted in 1947 to provide for the leasing of federal lands not already covered by the Mineral Leasing Act of 1920, which applied only to public domain lands and not to lands obtained by purchase, donation or condemnation. 30 U.S.C. § 357 provides that nothing in the Act shall be construed to affect the rights of the states to levy and collect taxes upon the output of mines from lessees of the United States. A virtually identical provision in the Mineral Leasing Act of 1920 was interpreted by the United States Supreme Court as authorizing the states to collect severance taxes from lessees of public domain lands. Mid-Northern Oil Co. v. Walker, 268 U.S. 45, 45 S.Ct. 440, 69 L.Ed. 841 (1925).
[14] When a federal court rules in a matter over which it has no jurisdiction, its decisions, opinion, and orders are without effect. Matter of Schwamb, 169 B.R. 601 (E.D.La.1994), aff'd., 48 F.3d 530 (5th Cir.1995), cert. denied sub nom. Delta Airlines, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Penn., ___ U.S. ___, 115 S.Ct. 2555, 132 L.Ed.2d 809 (1994).
[15] MRT Exploration Company v. McNamara, 94-0063 (La.App. 1st Cir. 12/29/94); 648 So.2d 1108, writ granted in part; denied in part, 95-0565 (La.5/19/95); 654 So.2d 1083; cert. denied, ___ U.S. ___, 116 S.Ct. 192, 133 L.Ed.2d 128 (1995), on remand, 94-0063 (La.App. 1 Cir. 2/23/96); 669 So.2d 1338. Based on a stipulation in the trial court record, the appeal court declined to consider the merits of plaintiff's argument that the amendment to La.R.S. 51:1 affected the state's right to collect taxes before the effective date of the amendment. We granted, in part, the writ application of the mineral lessees and remanded the case to the court of appeal because we did not believe that the stipulation entered into was intended as a waiver of that issue. On remand, the First Circuit ignored our interpretation of the pre-amendment version of La.R.S. 52:1 in Murphy, wherein we expressly found that the statute did not prohibit the imposition of the severance tax. The court of appeal held that La.R.S. 52:1, prior to its amendment, evidenced the state's intent to exempt Barksdale from all taxes, including severance taxes, and held that the amendment to La.R.S. 52:1 effected a change in the prior law, such that the severance tax could be imposed only after the effective date of the amendment. The state's application for certiorari is stayed pending the resolution of this suit.
[16] Our reasons for ruling make it unnecessary for us to consider the merits of the state's argument that La.R.S. 52:2 rather than La.R.S. 52:1 governs this controversy.
[17] What constitutes an "income tax" within the meaning of the Buck Act is a question of federal law. The definition of "income tax" at 4 U.S.C. § 110(c) is broad and has been interpreted to cover a wide variety of taxes, however denominated. See, e.g., Rountree v. City and County of Denver, 197 Colo. 497, 596 P.2d 739 (1979) (occupation tax); City of Portsmouth v. Fred C. Gardner Co., Inc., 215 Va. 491, 211 S.E.2d 259 (1975) (license tax); General Dynamics Corp. v. Bullock, 547 S.W.2d 255 (Tex.1976), cert. denied, 434 U.S. 1009, 98 S.Ct. 717, 54 L.Ed.2d 751 (1978) (franchise tax). We note particularly that the Texas severance tax computed on the value of oil and gas has been held to fall within the definition of an "income tax" for purposes of the Buck Act. Humble Oil & Refining Company v. Calvert, 478 S.W.2d 926 (Tex.1972), cert. denied, 409 U.S. 967, 93 S.Ct. 293, 34 L.Ed.2d 234. Under the reasoning in that case, any accession to wealth, whether or not received in dollars, constitutes "income." Thus interpreted, even Louisiana's severance tax on natural gas, computed on the quantity of gas severed, can be regarded as an "income tax" because it is a tax on the accession to wealth resulting from the severance of natural gas. Moreover, even though the lease in question was granted in 1961 pursuant to Presidential Orders, we nevertheless believe that the Mineral Leasing Act for Acquired Lands, by its amendment in 1976, became applicable to the lease at issue.
[18] Commissioners of Sinking Fund of City of Louisville v. Howard, 248 S.W.2d 340 (Ky.1952), aff'd sub nom. Howard v. Commissioners of Sinking Fund of Louisville, 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953); Davis v. Howard, 306 Ky. 149, 206 S.W.2d 467 (1947). See also Silas Mason Co. v. Tax Commission, 302 U.S. 186, 207, 58 S.Ct. 233, 243-44, 82 L.Ed. 187 (1937).